Marcos Perez JIMENEZ, Appellant,

v.

Manuel ARISTEGUIETA, Intervenor,
Appellee,
and
John E. Maguire, Appellee,
No. 19507.

United States Court of Appeals
Fifth Circuit.

Dec. 12, 1962.

David W. Walters, Walters, Moore & Costanzo, Miami, Fla., for appellant.

Howard C. Westwood, Washington, D. C., William G. Ward, Miami, Fla., William H. Allen, William A. Dobrovir, Brice M. Clagett, Washington, D. C., James L. Hiss, Miami, Fla. (Covington & Burling, Washington, D. C., Ward & Ward, Miami, Fla., of counsel), for intervenor-appellee.

Irving Jaffe, Atty. Dept. of Justice, Washington, D. C. (Nicholas deB. Katzenbach, Deputy Atty. Gen., Edward F. Boardman, U. S. Atty., Miami, Fla., on the brief), for appellee, John E. Maguire.

Before JONES and BELL, Circuit Judges, and ESTES, District Judge.

ESTES, District Judge.

This is an appeal from the judgment of the United States District Court for the Southern District of Florida, Judge Wm. A. McRae, Jr., dated August 23, 1961, dismissing the original and amended petitions for habeas corpus filed by appellant, Marcos Perez Jimenez, and discharging the original and amended orders to show cause issued on the petitions for habeas corpus. The petitions for habeas corpus incorporate by reference the entire file in an international extradition proceeding under 18 U.S.C.

§ 3184 et seq., filed in the United States District Court for the Southern District of Florida, Miami Division, on August 24, 1959, by Manuel Aristeguieta, Consul General of the Republic of Venezuela, on behalf of appellee, the Republic of Venezuela (Venezuela), in which the return to Venezuela of appellant, a former president of Venezuela, now in Miami, Florida, is sought under the Treaty of Extradition between the United States and Venezuela (43 Stat. 1698).[1]

Appellant's amended petition for habeas corpus under 28 U.S.C. § 2241 asserts that the extradition file discloses defects which made unlawful both his commitment to custody and his detention under orders entered therein by Chief Judge George W. Whitehurst of the United States District Court for the Southern District of Florida.

Appellee's return to the order to show cause justified appellant's commitment and detention on the basis of the propriety of Judge Whitehurst's orders, and urged that the extradition file disclosed no defects cognizable upon a petition for writ of habeas corpus.

No testimony being offered, after argument of counsel Judge McRae entered the judgment which is the subject of this appeal, holding as a matter of law that the pleadings and papers before him disclosed no cause for issuance of the writ of habeas corpus.

The extradition proceeding was initially heard by Judge William C. Mathes, of the United States District Court for the Southern District of California, sitting in Miami by designation. On March 8, 1960 Judge Mathes permitted the filing of Venezuela's Second Amended Complaint; issued a new warrant for the arrest of appellant returnable "before me", and "with the consent of both plaintiff and defendant" continued appellant's release on bond previously posted. Thereafter the extradition case proceeded before Judge Mathes until Venezuela closed its evidence, all of which was documentary. Appellant's motion to dismiss was denied by Judge Mathes "without prejudice to a renewal of it at the close of the evidence."

In accordance with an order of the Judicial Council of the Fifth Circuit of October 7, 1960, for assignment "to some other judge" of any "unfinished business" of Judge Mathes, Chief Judge Whitehurst ordered the extradition case assigned to himself on March 6, 1961, and proceeded with hearings therein.

The extradition proceeding was concluded by orders entered by Judge Whitehurst, under 18 U.S.C. § 3184, finding that the proof did not establish

---

1. The first warrant of arrest was issued August 24, 1959 by Judge Joseph B. Lieb, who commanded the appellant to be brought before him. The appellant was not brought before Judge Lieb, however, but was brought before Judge Emett C. Choate, who released him on bond on August 25, 1959. A motion to quash the warrant of arrest was brought, not before Judge Lieb, but before Judge William C. Mathes. Judge Mathes held hearings before he quashed Judge Lieb's warrant of arrest on September 24, 1959. On the same day Judge Mathes also issued his own warrant and permitted Venezuela to file an amended complaint "as sworn to on September 11, 1959" in a hearing "before this court * * * and signed in the presence of this court." This complaint attached supporting documents including the order of the Federal Court (now the Supreme Court of Justice) of the Republic of Venezuela for the arrest of appellant and its ruling that there is probable cause to believe the appellant guilty, that Court's determination that extradition of the appellant be sought from the Government of the United States, and copies of correspondence between Venezuela and its representatives, on the one hand, and the State Department of the United States on the other hand, including the request on behalf of Venezuela for the appellant's extradition.

On October 21, 1959, Venezuela filed and served on appellant "the original extradition documents" duly authenticated, which included charges by the Attorney General of Venezuela, the finding of the highest court of that country that the charges and evidence established cause for prosecution and arrest, the warrant and arrest of that court and a substantial quantity of evidence submitted to that court.

probable cause on the charges of murder and participation in murder. He further found that probable cause had been shown as to each of the financial crimes which were separately and independently alleged in plaintiff's Second Amended Complaint and that the acts charged constituted crimes named in the specified provisions of the Treaty of Extradition, and he committed the appellant to the custody of the appellee United States Marshal to await the action of the Secretary of State under 18 U.S.C. § 3186. The order of commitment was entered by Judge Whitehurst on June 16, 1961. His findings and order of certification to the Secretary of State, entered June 23, 1961, attach a copy of the Second Amended Complaint in the extradition proceeding, to which certain sections of the certification order specifically refer.

Venezuela's Second Amended Complaint, upon which the extradition proceeding and orders under attack were based, charged appellant, chief executive of Venezuela (first as a member of a three-man junta, then as provisional President, and later as President), having legal responsibility for the administration of the funds and contracting authority of Venezuela, with two distinct groups of crimes committed in Venezuela during the years 1948–1958, the first group composed of four charges of murder and participation in murder as an accessory before the fact, the second group comprised financial crimes for his own private personal gain. The financial crimes are separately and independently charged in the complaint and are based on certain alleged transactions briefly summarized as follows:

1. The appellant secured commissions or kickbacks in ten specific instances on Venezuelan Government contracts, some of which the appellant himself had executed.

2. Through a "front" or alter ego the appellant secured a portion of the compensation paid by the Venezuelan Government for two tracts of land expropriated by decrees promulgated by him.

3. By his twenty per cent ownership of EVICSA, a construction company, the appellant secured a portion of the compensation paid by the Venezuelan Government on construction contracts with the appellant's Ministry of Development, with the connivance of two of his ministers, one of whom was head of that ministry.

4. The appellant secured improvements on and maintenance of his private, personal estate at public expense at specified times.

The charges of financial crimes allege that the transactions numbered 1 through 4 above make appellant guilty of embezzlement or criminal malversation by a public officer as provided in paragraph 14 of Article II of the Treaty, guilty of fraud or breach of trust as provided in paragraph 20 of Article II of the Treaty, and that the transactions numbered 1 through 3 above make him guilty of receiving money or valuable securities knowing the same to have been unlawfully obtained as provided in paragraph 18 of Article II of the Treaty.

The same charges are pending in the Supreme Court of Justice (formerly the Federal Court), the highest court of Venezuela, upon petition of the Attorney General of Venezuela with a substantial quantity of supporting evidence. The Supreme Court of Justice determined that if the charges are proved they would constitute violations of the penal code of Venezuela and that such charges are crimes specified in the Treaty of Extradition Article II, paragraphs 14, 18 and 20; found that good cause had been shown for prosecution and issued its warrant of arrest. The proceedings before the Supreme Court of Justice, with a substantial amount of evidence from its record—all documentary—were transmitted to the United States through appropriate diplomatic channels. Venezuela invokes these Treaty provisions in its complaint and requisition for surrender of appellant.

Appellant contends that Judge McRae erred in not discharging appellant from custody on the grounds that: (1) Judge Whitehurst did not have jurisdiction to conduct the extradition proceeding, (2) appellant was not accorded due process of law in the proceeding before Judge Whitehurst, sitting as extradition magistrate, (3) the acts for which appellant's extradition is sought are acts in the exercise of sovereign authority or acts of state the legality of which the judicial authorities of the United States have no authority to determine, (4) failure of the extradition magistrate to determine whether the claim for extradition was for any crime or offense of a political character or for acts connected with such crimes or offenses, (5) the decision of Judge Whitehurst was not based on legal, competent and adequate evidence, (6) the alleged financial crimes were not within the Treaty of Extradition, and (7) the extradition magistrate was without jurisdiction by virtue of Article XII of the Treaty of Extradition, inasmuch as the Venezuelan government had failed to lay legal evidence of criminality before the extradition magistrate within the two months prescribed by the Treaty.

## I.

■ Appellant first urges that Judge Whitehurst did not have jurisdiction to conduct the extradition proceeding because the warrant of arrest was made returnable before Judge Mathes—not Judge Whitehurst, contending that the statute (18 U.S.C. § 3184) and the Treaty (Article XII) authorize only that particular justice, judge or commissioner who issues the warrant of arrest or who is "designated in the warrant of arrest" to hear and consider the evidence of criminality. Section 3184 authorizes "any justice or judge of the United States, or any commissioner authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any state" upon complaint made under oath, to "issue his warrant for the apprehension of the person so charged, that he may be

brought before such justice, judge, or commissioner, to the end that the evidence of criminality may be heard and considered."

The Section continues that if on such hearing he deems the evidence sufficient "he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State". While a literal reading of the language quoted might be susceptible of appellant's contention that only the magistrate issuing the warrant may hear and consider evidence of criminality, this language is equally consistent with a construction which would permit any authorized justice, judge or commissioner to issue a warrant and that the accused may be brought before "such justice, judge or commissioner", meaning *any* justice, judge or commissioner authorized to hear and consider evidence of criminality.

The literal construction urged by appellant has been rejected in Grin v. Shine, 187 U.S. 181, 23 S.Ct. 98, 47 L. Ed. 130, where a United States District Judge issued a warrant of arrest in extradition making the warrant returnable before a United States Commissioner. The commissioner's jurisdiction was challenged on the ground, among others, that the warrant was required to be made returnable before the judge who issued it. The Supreme Court stated:

"It may be said that technically the warrant should be made returnable before the magistrate issuing it, but where it is made returnable before another officer, having the same power and jurisdiction to act, we do not think it is fairly open to criticism." (PP. 187–188, 23 S.Ct. p. 101)

In Pettit v. Walshe, 194 U.S. 205, 219, 24 S.Ct. 657, 48 L.Ed. 938, the Supreme Court held it was proper to bring the accused before an authorized commissioner in Indiana to hear and consider evidence of criminality, instead of before the United States Commissioner in New York who issued his warrant of

arrest in extradition. This case supports the more reasonable construction of the statute that *any* justice, judge or commissioner authorized to act may hear and determine evidence of criminality, notwithstanding that he is not the same justice, judge or commissioner who issued the warrant of arrest.

Appellant's attempt to limit the holding in Grin v. Shine to mean only that the warrant may be returnable either before the warrant-issuing magistrate or before another magistrate specifically "designated in the warrant" is not convincing. We think Grin and Pettit mean that any judicial officer in the class authorized by the statute may hear evidence of criminality after a warrant is issued.

The narrow construction appellant urges would place undue technical burdens of procedure on foreign countries seeking the surrender of fugitives not contemplated by the Treaty which was made

> "to facilitate the course of punitive justice and to limit the crimes which may be committed in their respective territories, * * *
>
> "To deliver up to justice by means of requisition duly made as herein provided any person who may be charged with * * * any of the crimes committed within the jurisdiction of one of the contracting parties and specified in Article II."

Appellant argues that the Judicial Council of the Fifth Circuit was authorized under 28 U.S.C. § 332 only to "administer the business of the courts"; that a "judge" in an extradition case is not a "court" and "the assignment of a judge to an extradition matter does not vest him with jurisdiction" since "jurisdiction is invoked only after a warrant is made returnable to him"; and, that Judge Mathes never lost and Judge Whitehurst never acquired jurisdiction in the extradition case.

Appellant cites cases, including collateral proceedings in this extradition case [2] showing that jurisdiction in an extradition matter is vested in justices, judges or commissioners, and not "in courts". These cases relate to discovery motions and only determine that the jurisdiction of appellate courts has been confined to review of certain orders and judgments of "courts" and does not extend to review of the extradition "judge's" findings. This extradition proceeding was "the business of the courts" and Judge Whitehurst's assignment to hear the evidence of criminality under the order of the Judicial Council of the Fifth Circuit and Chief Judge Whitehurst's order was a proper exercise of their authority. The reassignment did not constitute any attempt to review any action of Judge Mathes as extradition magistrate. Certainly the office of United States District Judge held by Judge Whitehurst is one that under 18 U.S.C. § 3184 has jurisdiction of extradition proceedings, and he was authorized to act.

Moreover, the orders of Judge Whitehurst of March 23, 1961 and May 2, 1961 ordering that the appellant personally appear before him for the purpose of hearing and considering the evidence, with the Second Amended Complaint actually before him, together with appellant's bond conditioned upon compliance with the orders of the court, would satisfy the requirement of a warrant even as construed by appellant in this case since the purpose of the order commanding the accused to appear under 18 U.S.C. § 3184 is "that the evidence of criminality may be heard and considered." Appellant did not object to Judge Whitehurst presiding on this ground until the judge had found against him. The omission complained of pro-

2. Aristeguieta v. Jimenez (5 Cir. 1960), 274 F.2d 206, cert. granted 365 U.S. 840, 81 S.Ct. 798, 5 L.Ed.2d 807; First National Bank of New York v. Aristeguieta, 287 F.2d 219 (2 Cir. 1960), cert. granted 365 U.S. 840; Jimenez v. Aristeguieta, 290 F.2d 106 (5 Cir. 1961).

vides no ground for release on habeas corpus.[3]

■ At argument this court *sua sponte* raised the question as to whether the Judge of a United States District Court established under Section 2 of Article III of the Constitution called "constitutional courts" (Ex parte Bakelite Corp., 279 U.S. 438, 449, 49 S.Ct. 411, 73 L.Ed. 789; 1 Moore's Federal Practice ¶0.4) can be, either authorized or required to perform the functions of an extradition magistrate. Counsel for all parties agree that the constitutional judge may be so authorized. In re Metzger, 5 Howard 176, 46 U.S. 176, 12 L.Ed. 104 (1847) was cited. In that case the Judge acted at the instance of the executive before Congress, in 1848, 9 Stat. 302, made specific provision for a judicial proceeding in extradition. We have been cited to no case in which this question has been raised. We agree that the Judge of a constitutional court may be so authorized. It is unnecessary for us to decide whether such a judge could be required to act as an extradition magistrate.

## II.

■ Appellant's second point urges that Judge McRae erred in restricting his review of the extradition proceedings on habeas corpus to the following: "(1) whether the magistrate had jurisdiction, (2) whether the offense charged is within the Treaty, and (3) whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty"; and in not determining that appellant was denied due process of law in that (1) Judge Whitehurst had not heard, examined, considered and read all of the evidence of criminality as required by Article XII of the Treaty and 18 U.S.C. § 3184, (2) Judge Whitehurst did not examine and consider separately the evidence pre-

sented to determine whether in each case there existed probable cause that a crime enumerated within the Treaty had been committed by appellant as charged, and (3) Judge Whitehurst refused appellant's request to take the deposition of Dupouy.

The standard applied by Judge McRae in conducting the habeas corpus hearing was correct. Mr. Justice Holmes in Fernandez v. Phillips, 268 U.S. 311 at 312, 45 S.Ct. 541 at 542, 69 L.Ed. 970 stated:

"* * * That writ as has been said very often cannot take the place of a writ of error. It is not a means for rehearing what the magistrate already has decided. The alleged fugitive from justice has had his hearing and *habeas corpus* is available only to inquire whether the magistrate had jurisdiction, whether the offence charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty. * * *"

All of Venezuela's evidence of criminality was documentary and was presented before Judge Mathes. It was voluminous. All of appellant's evidence (including testimony of witnesses) was presented before Judge Whitehurst. Both sides had, at the request of Judges Mathes and Whitehurst, submitted fact memoranda or analyses of the evidence. On June 16, 1961 Judge Whitehurst announced at the conclusion of extended hearings and arguments before him that probable cause had not been established with respect to the murders, but that probable cause had been established with respect to the financial crimes charged.

While discussing the form of the order of certification and findings to be

---

3. Stamphill v. Johnston, 136 F.2d 291, 292 (9 Cir. 1943), cert. den. 320 U.S. 766, 64 S.Ct. 70, 88 L.Ed. 457 (1943).

 Nor would such an omission be ground for objection on appeal in other types of

cases. Albrecht v. United States, 273 U.S. 1, 8-10, 47 S.Ct. 250, 71 L.Ed. 505 (1927).

entered by Judge Whitehurst on June 23, 1961, and after counsel had called to the attention of the court the provisions of paragraph 12 of the proposed order of certification finding that the evidence submitted sustains each of the charges of financial crimes according to the probable cause standard contemplated by 18 U.S.C. § 3184, Judge Whitehurst read the paragraph and stated

> "All right. This, in a general way, finds that each of the specifications has been sustained. That is the general findings, that each of these specifications is supported by the evidence."

Then appellant's counsel inquired whether the judge had "read all of the evidence in connection with this?" Judge Whitehurst replied:

> "No, I haven't read all the evidence. I simply took counsel's analysis of the evidence."

■ From Judge Whitehurst's certification to the Secretary of State that the certification was made by him "upon consideration of all of the evidence submitted, the pleadings of the parties, the arguments of counsel, written and oral, and the orders heretofore entered herein" and other comments of Judge Whitehurst on this occasion and from a realistic view of his conduct of this proceeding we conclude that although he may not have read "all"—in the sense of every word in the enormous record before him, he did read the record and hear, examine and consider the evidence of criminality of appellant as required by the Treaty and the statute.

■ Appellant's contention that Judge Whitehurst did not examine and consider the evidence presented and determine in each case whether there existed probable cause that a crime was committed by appellant as charged is refuted by the above quoted statement of Judge Whitehurst that "each of these specifications is supported by the evidence" and by his certification to the

Secretary of State that the evidence submitted sustains each of the charges of financial crimes separately and independently alleged in Venezuela's Second Amended Complaint according to the probable cause standard contemplated by 18 U.S.C. § 3184 and the Treaty.

■ In support of his contention that he was denied due process of law in Judge Whitehurst's refusal of his request to take the deposition of Napoleon Dupouy appellant points to 18 U.S.C. § 3191 which provides that "witnesses" whose evidence is material to his defense may be subpoenaed on behalf of persons unable to pay the fees of "such witnesses". Section 3191 relates to the subpoenaing of *witnesses* and *not* to *depositions*. In re Luis Oteiza y Cortes, 136 U.S. 330, 10 S.Ct. 1031, 34 L.Ed. 464 held that the predecessor statute to Section 3191 "does not apply to documents or depositions offered on the part of the accused" and "that all the provisions of the law and the statute contemplated the production of the defendant's witnesses in person before the magistrate for examination by him." It was held in a collateral discovery proceeding in this case that 18 U.S.C. § 3190 permitting the use of properly authenticated *ex parte* depositions presented by the demanding country "are not available to the defendant".[4] The accused is not entitled to introduce evidence which merely goes to his defense but he may offer limited evidence to explain elements in the case against him, since the extradition proceeding is not a trial of the guilt or innocence but of the character of a preliminary examination held before a committing magistrate to determine whether the accused shall be held for trial in another tribunal. Collins v. Loisel, 259 U.S. 309, 42 S.Ct. 469, 66 L.Ed. 956; Charlton v. Kelly, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274. Even if a deposition were available the denial of appellant's belated request for the deposition of Dupouy would not constitute abuse of the extradition judge's

4. First National City Bank of New York v. Aristeguieta. Footnote 2 supra.

"judicial discretion, and his judgment cannot be reviewed upon this proceeding." In re Luis Oteiza y Cortes, supra.[5] Dupouy was in the United States. He was a party to the case in New York City opposing Venezuela's effort to secure evidence regarding appellant's funds on deposit in certain banks, and Judge Whitehurst did not deny appellant the right to offer Dupouy as a witness.

There is no merit to appellant's contention that he was denied due process of law in the extradition proceeding.

### III.

Appellant contends that the acts with which he is charged are "acts done in the exercise of or in color of his sovereign authority and by virtue of the law of nations as stated in Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456, was entitled to be discharged from custody inasmuch as the judicial authorities cannot review the acts done by a sovereign in his own territory to determine illegality".[6]

Seizing upon Venequela's characterization of appellant as a "dictator" he argues that as a "dictator" he himself would be the sovereign—the government of Venezuela—and that all his acts constituting the financial crimes with which he is charged and as to which probable cause of guilt has been found

are acts of state or sovereign acts, the legality of which the Act of State Doctrine precludes an extradition judge or magistrate from adjudicating.

Essentially the Act of State Doctrine is "the principle that the conduct of one independent government cannot be successfully questioned in the courts of another * * *." Oetjen v. Central Leather Co., 246 U.S. 297, 303, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918).

Even though characterized as a dictator, appellant was not himself the sovereign—government—of Venezuela within the Act of State Doctrine. He was chief executive, a public officer, of the sovereign nation of Venezuela. It is only when officials having sovereign authority act in an official capacity that the Act of State Doctrine applies. Bernstein v. Van Heyghen Freres, S. A., 163 F.2d 246, 249 (2d Cir.1947), cert. den. 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357 (1947); Banco de Espana v. Federal Reserve Bank, 114 F.2d 438, 444 (2d Cir. 1940).

Appellant's acts constituting the financial crimes of embezzlement or malversation, fraud or breach of trust, and receiving money or valuable securities knowing them to have been unlawfully obtained as to which probable cause of guilt had been shown were not acts of

---

5. See also Gallina v. Fraser, 177 F.Supp. 856 (D.C.Conn.1959), affirmed 278 F.2d 77 (CA 2, 1960), cert. den. 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 199 (1960).

6. Appellant relies on Subdivision (c) (4) of 28 U.S.C. § 2241 the habeas corpus statute, which provides that the writ shall extend to citizens and domiciliaries of a foreign state "in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof, the validity and effect of which depend upon the law of nations."
 This is only a jurisdictional provision conferring no substantive right on appellant to discharge from custody merely upon allegation of jurisdictional facts. See Horn v. Mitchell, 223 F. 549, affirmed

232 F. 819 (1 Cir. 1916), appeal dismissed 243 U.S. 247, 37 S.Ct. 293, 61 L.Ed. 700.
 "The Act of State Doctrine, briefly stated, holds that American courts will not pass on the validity of the acts of foreign governments performed in their capacities as sovereigns within their own territories. * * * This doctrine is one of the conflict of laws rules applied by American courts; it is not itself a rule of International Law." Banco Nacional de Cuba v. Sabbatino, 2 Cir., 307 F.2d 845, p. 855.
 "International law is derived indeed from the customs and usages of civilized nations, but its concepts are subject to generally accepted principles of morality whether most men live by these principles or not." Id., p. 860.

Venezuela sovereignty. Judge Whitehurst found that each of these acts was "for the private financial benefit" of the appellant. They constituted common crimes committed by the Chief of State done in violation of his position and not in pursuance of it. They are as far from being an act of state as rape which appellant concedes would not be an "Act of State".

A policy underlying the Act of State Doctrine is that to adjudicate the validity of an act of a foreign government under its own law in the courts of the United States would "imperil the amicable relations between governments and vex the peace of nations." Oetjen v. Central Leather Co., supra.

The judiciary abstains from decision in the ordinary Act of State case in deference to the executive, the branch of government charged with international relations. In a comprehensive and discriminating opinion on the Act of State Doctrine by Judge Waterman of the Second Circuit, in Banco Nacional de Cuba v. Sabbatino,[7] it was held that

"* * * when the executive branch of our Government announces that it does not oppose inquiry by American courts into the legality of foreign acts, an exception to the judicial abnegation required by the act of state doctrine has arisen."

In this extradition case the executive branch, through its representation of the appellee United States Marshal, has manifested its desire that the judiciary act and decide this case on its merits.

Underhill v. Hernandez does not support appellant's claim of sovereign immunity. In that case a citizen of the United States brought an action in United States courts for damages for unlawful detention and assault in Venezuela by soldiers in the revolutionary forces in Venezuela under the command of Hernandez. The Supreme Court held that Hernandez, as a military commander representing a *de facto* government in the prosecution of a war, was not civilly responsible for those acts; pointed out that Hernandez was not "actuated by malice or any personal or private motives;" and made it clear that its decision would have been otherwise had defendant's action been differently motivated, as is the case here. Judge Whitehurst expressly found that the acts of appellant establishing probable cause of guilt of the financial crimes were "for the private financial benefit of the defendant".

The very reason for this extradition case is that the United States has agreed with Venezuela for the extradition of persons charged with crimes enumerated in the Treaty. This Treaty deals expressly in paragraph 14 of Article II with embezzlement or criminal malversation by public officers. Appellant notes that a public officer is one who exercises "in part sovereign power".[8] The two governments intended the tribunals to act when the accused is a public officer charged with crimes enumerated in the Treaty. The acts constituting crimes charged for which the extradition of appellant is sought are not "acts of Venezuela" as in Hernandez, and the Act of State Doctrine is no bar to this extradition proceeding or justification for the discharge from custody of appellant.

## IV.

 Even though Judge Whitehurst found that the evidence failed to connect appellant with the murders and that it was unnecessary to determine whether or not these crimes were of a political character, appellant contends that Judge Whitehurst also should have made a finding as to whether the murders were political crimes and found that the murders were political and that the financial crimes were "acts connected with such (political) crimes or offenses" within the meaning of Article III of the Treaty because they were joined in the same com-

---

7. 307 F.2d 845, 857.

8. Appellant's Brief p. 139, Note.*

plaint with the murders. He argues that the word "claim" in Article III (that "the provisions of this convention shall not import claim of extradition" for political offenses) refers to the extradition complaint and that if any crime or offense contained in the complaint is of a political character or is an act connected with a political crime or offense, the entire "claim" must be denied, notwithstanding the absence of any relationship of the several crimes or offenses with each other. Article III speaks of "*acts* connected with" political crimes and not of "charges" in a legal document. The necessary connection is between such acts or events and other acts or events. It is not the connection effected by charges being in the same legal paper.

Since appellant had no connection with the murders charged in the complaint, those acts could not be political acts or crimes attributable to appellant and whether or not the homicides were political crimes by those who committed them can have no bearing on the appellant.

The murders are no longer in the case.

■■■ Judge Whitehurst's decision that the financial crimes were not political was based upon the evidence and is not reviewable here. Cf. Ornelas v. Ruiz, 161 U.S. 502, 509, 16 S.Ct. 689, 40 L.Ed. 787.

In In re Ezeta, 9 Cir., 62 F. 972, five separate extradition complaints charging five persons with murder, attempted murder and robbery were heard and considered in one proceeding in which one final order was entered. One defendant, Cienfuegos, was charged with three crimes; two murders and an attempted murder. The extradition magistrate held that the crimes charged, save the attempt to murder, "were all committed during the progress of actual hostilities between the contending forces * * * against the active operations of a revolutionary uprising", Id. p. 997, and were therefore political crimes immune from extradition, but the attempted murder occurring before the rebellion, was "free from any political aspect", Id. 986, and the magistrate committed Cienfuegos for extradition for the non-political crime of attempted murder.

The fact that there were five separate complaints in Ezeta and one in the present case is a difference of form and not of substance.

Nothing in Karadzole v. Artukovic, 247 F.2d 198 (C.A. 9, 1957) reversed, 355 U.S. 393, 78 S.Ct. 381, 2 L.Ed.2d 356, suggests that a finding of whether or not an alleged offense is political must be made when no probable cause of guilt of the offense has been found. This case supports our view that, where several offenses are charged and one or more may be political, extradition may nevertheless follow for those which are not political. The memorandum from the Secretary of State[9] submitted in the Artukovic case expresses the Secretary's opinion that no valid reason exists for not allowing an extradition hearing to take place since it could not "reach the conclusion that all of the acts alleged by the Yugoslav government to have been committed by Artukovic are necessarily of a 'political character' merely on the basis of the pleadings" and "that it does not appear on the face of the pleadings that all of the offenses which Artukovic is therein alleged to have committed were necessarily connected with such struggle for power." The State Department memorandum comments that while there is a suggestion in the indictment that the acts of Artukovic constituted war crimes, it is nevertheless the opinion of the Department "that some of the murders alleged to have been committed might constitute 'murder within the terms of the extradition Treaty here involved'". Implicit in the Supreme Court's per curiam order vacating the judgment of the Court of Appeals and remanding the case for

9. Part of which appears in the note on p. 94 of Appellant's Brief and all of which is set forth in the Appendix to the Brief of Appellee John E. Maguire.

hearing under 18 U.S.C. § 3184 is a holding that even if *some* crimes charged in a single complaint are political, a hearing that may result in a finding of extraditability shall nevertheless be had under Section 3184, where the complaint may include other crimes that are non-political.

There is no evidence that the financial crimes charged were committed in the course of and incidentally to a revolutionary uprising or other violent political disturbance.

Venezuela seeks the surrender of appellant by the executive officers of the United States (who must ultimately determine whether fugitives shall be surrendered) for trial of appellant on the financial crimes only. The claim of extradition for appellant, within the meaning of the Treaty, is not based on any crime or offense of a political character or on acts connected with such crimes or offenses. Judge McRae did not err in failing to remand the extradition proceedings for further findings.

## V.

 Judge Whitehurst's finding that the evidence was sufficient to sustain the charges specified, as certified to the Secretary of State, was based upon legal, competent and adequate evidence under 18 U.S.C. § 3190. A *prima facie* case was established by the filing of the charges by the Attorney General of Venezuela, the findings of the highest court of that country that the charges and evidence established cause for prosecution and arrest, the warrant of arrest, and a substantial quantity of evidence submitted to the Supreme Court of Justice of Venezuela. First National City Bank of New York v. Aristeguieta, 287 F.2d 219, 227 (2 Cir., 1960), cert. granted 365 U.S. 840, 81 S.Ct. 803, 5 L.Ed.2d 807.

The record shows that appellant, in November, 1948, was a young lieutenant colonel in the Venezuelan army, of very modest means. By a coup d'etat, appellant and two other lieutenant colonels established a three-man military junta, which was to rule in accordance with the

Constitution and laws of Venezuela. As a member of the Junta, the appellant was required by law to file a statement of his assets upon taking office. His sworn statement, filed on March 14, 1949, showed that he and his wife then possessed total net assets equivalent to $31,-343.28.

In the succeeding nine years the record discloses that appellant was enriched by more than $13,000,000 in excess of his opening net worth and his legitimate compensation. All during this period the laws of Venezuela prohibited anyone in appellant's position from engaging in commercial transactions with the nation, directly or indirectly. Evidence of Appellant's financial dealings was found in a suitcase which he left behind when he hastily fled Venezuela, on January 23, 1958. The suitcase bore the initials of appellant's wife, "F.P.J.," and contained securities, title deeds, banking documents, personal memoranda, currency, and a major general's uniform. That the suitcase and its contents belonged to appellant is clear from a radiogram sent by appellant's wife from the Dominican Republic, appellant's first stop in his flight from Venezuela, and from a letter he wrote on October 24, 1958, from Miami, Florida.

The record reflects that Dr. Napoleon Dupouy was an intimate and close associate of appellant; that he exerted a strong influence in connection with government contracts; that he reported regularly to appellant and received commissions on government contracts which were shared with appellant. Papers and memoranda in the handwriting of Dupouy and appellant, found in appellant's suitcase, evidence the fact that appellant received commissions or "kickbacks" in the ten specific instances alleged in the second amended complaint.

Dupouy was nominal president of a construction company, Empresas Champenon Bernard de Venezuela, S. A., a subsidiary of the French firm Champenon Bernard. On September 12, 1950, Champenon Bernard entered into a contract with the Venezuelan government for the

construction of three viaducts on the Caracas-LaGuaira expressway. Dupouy received as his commission 250,000 bolivares, which the written memoranda reflect that he shared equally with appellant.

On March 18, 1949, the appellant, as Minister of Defense, contracted with the Swedish armaments manufacturer Akticbolaget Bofors for cannon, guns, parts and ammunition for the amount of $2,-358,060. Evidence from appellant's suitcase reflects that he received $58,951.50, which is precisely 2½ per cent of the Bofors contracts.

The memorandum written in Dupouy's hand found in appellant's suitcase evidences that appellant received $19,136.25 on a government contract of June 30, 1950, and $11,983 plus $5902 "to be delivered," totaling $17,885, on a contract of December 15, 1950.

Appellant, as Minister of Defense, on July 24, 1951 contracted with the British firm Vickers-Armstrong (Shipbuilders), Ltd. for the construction of a destroyer, "Aragua," for the amount of Lb. 2,637,-000. A memorandum by Dupouy evidences the fact that appellant received $168,979.

In connection with a contract for a ground-to-air communications system for 47 airports in Venezuela with International Standard Electric Company of New York, at a cost of $2,948,754, the evidence shows that appellant received $60,000 through checks from one Virgil C. Applewhite, who was vice-president of a Caracas firm which did preliminary work on the communications contract.

A handwritten memorandum prepared by Dupouy, found in appellant's suitcase, indicated that appellant received $785,-000 on the purchase of six destroyers from the Italian firm of Ansaldo, S. A.; $190,272 on a contract for the purchase of three Viscount aircraft, spare parts and spare engines; $258,744 on the purchase of 40 tanks with spare parts and ammunition from two French concerns; and $170,175 on the purchases of boats by the government of Venezuela.

The accountings and memoranda found in appellant's suitcase, in Dupouy's and appellant's own handwriting, and the depositions in the record establish probable cause that appellant unlawfully received commissions or kick-backs through Dr. Napoleon Dupouy in the ten instances alleged in the Second Amended Complaint.

The record shows that appellant, through a close associate, Fortunato Herrera, and a corporation called Polinversiones, received a portion of the compensation paid by the Venezuelan Government for two tracts of land expropriated by decrees promulgated by appellant. One of the transactions involved the property of a Mrs. Carmen Rafaela Agreda de Jiminez, which the government was taking over pursuant to a decree issued by appellant on August 15, 1952. In 1950 Mrs. de Jiminez had offered to sell the property to the government for B's 8,-500,000 and on September 5, 1952 again inquired about compensation for her land. Unable to secure the compensation due her, she gave an option to her attorney, Ascanio, to purchase the property for B's 10,000,000. Ascanio sought out Herrera, who assured him and Mrs. de Jiminez that his friendship with appellant would enable him to solve their problem. The official government appraisal of the property was B's 13,320,210.50. The government paid Mrs. de Jiminez with interest-bearing obligations, and Mrs. de Jiminez turned over the amount in excess of B's 10,000,000 to Herrera.

In the acquisition of land for highway construction Herrera acquired for Polinversiones an option from Industrial del Carton for the purchase of 40,304 square meters of land at B's 30 per square meter. The land was subsequently appraised by the government at B's 120 per square meter. Thus Polinversiones received a profit of B's 3,627,360 in less than a year on an investment of B's 1,209,120. It is clear from the evidence that appellant shared with Herrera in the profits of Polinversiones.

Appellant owned 20% of the stock in a construction company known as Em-

press Venezuelana de Ingeniera y Construccion, S. A., called by its initials, EVICSA. This company, on an initial capital investment of B's 500,000, earned profits of B's 6,713,223.96 between 1954 and 1958, largely on six government construction contracts.

The record reflects that appellant used on his private estate services of gardeners and other workmen on the public payroll and that a government agency drilled a well at appellant's El Penon estate.

■■■ The evidence was competent under 18 U.S.C. § 3190, which makes admissible, and therefore competent, documents submitted by the demanding government that satisfy certain specifications. Section 3190 provides that documents authenticated by the demanding government's authorities, so as to be admissible for similar purposes in tribunals of the demanding government, "shall be received and admitted as evidence" at an extradition hearing in this country "for all the purposes of such hearing"; and the certification of the principal United States diplomatic officer in the demanding nation "shall be proof" that the documents are so authenticated.

It has been held by the Supreme Court and the lower federal courts that "competent evidence to establish reasonable ground is not necessarily evidence sufficient to convict, nor only such as can pass technical rules governing the admissibilty of evidence in criminal trials." U. S. ex rel. Klein v. Mulligan, 50 F.2d 687, 688 (2 Cir. 1931), cert. den., 284 U.S. 665, 52 S.Ct. 41, 76 L.Ed. 563 (1931), and the cases cited therein.

■■■ With respect to the evidence upon which the extradition magistrate acted, it must be remembered that the extradition magistrate merely determines probable cause, making an inquiry like that of a committing magistrate and no more. Benson v. McMahon, 127 U.S. 457, 463, 8 S.Ct. 1240, 32 L.Ed. 234 (1888). Probable cause was given its

classic definition, on April 1, 1807, by Chief Justice John Marshall, sitting as committing magistrate in the treason prosecution of Aaron Burr. He held that he should not require evidence to convince himself that the defendant was guilty, but only that "furnishing good reason to believe that the crime alleged had been committed by the person charged with having committed it." [10]

■ The evidence of appellant's enrichment, with no proof of any lawful source of the funds, when considered with the evidence of appellant's transactions with Dupouy, Herrera, Polinversiones, EVICSA, and others is sufficient to warrant the finding that there was reasonable ground to believe the accused guilty of the financial crimes charged.

## VI.

The crimes charged to appellant as to which probable cause has been found are offenses extraditable by Article II of the Treaty of Extradition. The record is clear that these charges are, if proved, crimes in the demanding nation, that question having been determined by the highest court of Venezuela. It is significant in this regard that the charges come here as a result of proceedings before the Supreme Court of Justice of Venezuela.

The crimes as to which probable cause has been shown are within Article II, paragraph 14, of the Treaty—embezzlement or criminal malversation—which provides for the extradition of persons charged with:

"14. Embezzlement or criminal malversation, committed within the jurisdiction of one of the parties by public officers or depositaries, where the amount embezzled exceeds 200 dollars in the United States of America or B. 1.000 in the United States of Venezuela."

■ Criminal malversation includes a broad category of corrupt official prac-

10. United States v. Burr, 25 Fed.Cas. p. 2, 12, No. 1469a (C.C.D.Va.1807). Beveridge, The Life of John Marshall, Vol. III, p. 376.

tices. Webster's New International Dictionary defines the word "malversation" thus: "Evil conduct; fraudulent practices; misbehavior, corruption, or extortion in office." P. 1490 (2d ed. 1957). The Oxford English Dictionary lists two current meanings: "corrupt behaviour in an office, commission, employment, or position of trust"; and "corrupt administration *of* something"—and gives a number of instances of the use of the word in such broad senses, beginning in 1549 and continuing through the nineteenth century. 6 O.E.D. 94 (1933)

Black's Law Dictionary sets out the accepted definition:

> "In French law, this word is applied to all grave and punishable faults committed in the exercise of a charge or commission, (office,) such as corruption, exaction, concussion, larceny." P. 1112 (4th ed. 1951).

 There is evidence showing that appellant, as chief executive of Venezuela, used his position of power and authority to divert funds and services belonging to Venezuela to his own use and benefit. The offenses as to which probable cause has been certified constituted "embezzlement or criminal malversation."

 The crimes as to which probable cause has been shown are within Article II, paragraph 20, of the Treaty—fraud or breach of trust, which provides for extradition of persons charged with:

> "20. Fraud or breach of trust by a bailee, banker, agent, factor, trustee, executor, administrator, guardian, director, or officer of any company or corporation, or by any one in any fiduciary position, where the amount of money or the value of the property misappropriated exceeds 200 dollars in the United States of America or B. 1.000 in the United States of Venezuela."

The phrase "fraud or breach of trust" by an "agent · * * * or by any one in any fiduciary position," is very broad and covers the great variety of offenses alleged in this case. As chief executive of Venezuela, appellant was under a duty to supervise the contracting and other financial affairs of the nation as a public trust. The evidence shows that appellant, through arrangements with Dupouy, received a cut on government contracts; through a front man, Fortunato Herrera, engaged in self dealing; through his secret interest in EVICSA, received unlawful gains; and through the use of government labor and services on his private estate, failed to discharge the public trust which was imposed upon him.

 Except for the improvements upon appellant's estate, the crimes as to which probable cause has been found are within Article II, paragraph 18 of the Treaty—receiving—providing for extradition of persons charged with:

> "18. * * * receiving any money, valuable securities or other property knowing the same to have been unlawfully obtained, where the amount of money or the value of the property so * * * received exceeds 200 dollars in the United States of America or B. 1.000 in the United States of Venezuela."

The phrase "receiving any money or valuable securities * * * knowing the same to have been unlawfully obtained" reaches thirteen of the fifteen alleged acts. In the ten Dupouy contract "kickbacks", the two Herrera land frauds, and EVICSA the evidence shows that appellant received money or valuable securities knowing the same to have been unlawfully obtained.

## VII.

Appellant contends that the extradition magistrate was without jurisdiction by virtue of Article XII [11] of the Treaty

---

11. "Article XII.
 "If when a person accused shall have been arrested in virtue of the mandate

or preliminary warrant of arrest, issued by the competent authority as provided in Article XI hereof, and been brought be-

because appellee failed to lay before the extradition magistrate legal evidence of the appellant's guilt within the two months prescribed by the treaty.

■■ The two-month limitation of Article XII of the Treaty is inapplicable, for by its terms the provision relates only to an arrest resulting from a telegraphic request. This extradition case was not initiated by a telegraphic request, but by a sworn complaint filed on August 24, 1959 in the United States District Court. Even if applicable, Article XII was complied with, for the original extradition documents were filed on October 21, 1959, less than two months after appellant was first arrested, on August 25, 1959.

The Second Amended Complaint was filed on March 8, 1960, and a new warrant of arrest was issued and executed the same day. Almost all of the evidence of appellee was on file by April 9, 1960, well within the two-month period. In Voloshin v. Ridenour, 299 F. 134, 137–38 (5 Cir., 1924), it was held by this court that the period prescribed by a treaty is measured from the date on which the defendant is arrested on the basis of the complaint on which the hearing is held. It is therefore evident that the two-month limitation period of Article XII was not exceeded on either of the two warrants.

The record contains no reversible error and the judgment of the District Court dismissing the appellant's petition for habeas corpus and discharging the orders to show cause issued thereon is hereby Affirmed. The mandate of the Court will issue forthwith.

fore a judge or a magistrate to the end that the evidence of his or her guilt may be heard and examined as hereinbefore provided, it shall appear that the mandate or preliminary warrant of arrest has been issued in pursuance of a request or declaration received by telegraph from the Government asking for the extradition, it shall be competent to hold the accused for a period not exceeding two months, so that the demanding Government may

have opportunity to lay before such judge or magistrate legal evidence of the guilt of the accused, and if at the expiration of said period of two months such legal evidence shall not have been produced before such judge or magistrate, the person arrested shall be released, provided that the examination of the charges preferred against such accused person shall not be actually going on." 43 Stat. 1698, 1705.