**OCCIDENTAL PETROLEUM CORPORATION, a California corporation, and Occidental of Umm al Qaywayn, Inc., a California corporation, Plaintiffs,**

v.

**BUTTES GAS & OIL COMPANY, a corporation, Clayco Petroleum Corporation, a corporation, John Boreta, William H. Smith, E. David Philley, and Bruce J. Clayman, Defendants.**

Civ. No. 70-1397-HP

United States District Court,
C. D. California.

March 17, 1971.

11. See 29 U.S.C. § 159 for the method of replacing either a designated or selected collective bargaining representative.

94

Philip F. Westbrook, Jr. and Donald M. Wessling, O'Melveny & Myers, Arthur Groman, Mitchell, Silberberg &

Knupp, Los Angeles, Cal., Louis Nizer, Simon Rose and David G. Miller, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for plaintiffs.

Thomas H. Kuchel and Frank Rothman, Wyman, Bautzer, Finell, Rothman & Kuchel, Beverly Hills, Cal., for defendants, Buttes Gas & Oil Co., John Boreta and William H. Smith.

Maurice J. Hindin, Hindin, McKittrick & Marsh, Beverly Hills, Cal., for defendants, Clayco Petroleum Corp. and Bruce J. Clayman.

## OPINION AND ORDER

PREGERSON, District Judge.

This is a private antitrust suit for treble damages and an injunction,[1] brought by Occidental Petroleum Corporation and its wholly owned subsidiary Occidental of Umm al Qaywayn against the Clayco Petroleum Corporation ("Clayco") and its president, Clayman, and the Buttes Gas and Oil Company ("Buttes") and its officers Boreta and Smith.[2] The complaint charges the defendants with conspiracy in restraint of trade,[3] conspiracy to monopolize,[4] and attempted monopoly,[5] all with respect to "the exploration, development and exploitation of petroleum reserves of the territorial waters of the Trucial States." The plaintiffs and the defendant corporations are holders of offshore oil concessions granted by two adjacent sheikdoms in the Persian Gulf. Defendants are charged with instigating a presently pending international dispute over sovereign rights to a portion of the Gulf— allegedly covering the richest area of plaintiffs' concession—with the result that plaintiffs have been prevented from enjoying the fruits of their concession.[6]

The facts alleged in the complaint also constitute the basis of a claim for damages and injunctive relief, on the theory of inducing breach of contract, instituted in California state court between the present parties.

The court has before it separate motions to dismiss, urged respectively by Clayco and Clayman on the one hand and by the Buttes defendants on the other. Clayco and Clayman claim lack of personal jurisdiction, improper venue, and defective service of process. The Buttes defendants attack the face of the complaint, raising five substantive grounds allegedly warranting dismissal of the action. The two sets of motions will be considered separately.

### THE CLAYCO-CLAYMAN MOTION

Personal jurisdiction of defendant Clayman and venue as to him are governed by Section 4 of the Clayton Act, 15 U.S.C. § 15, which permits suit against a non-corporate defendant "in the district in which the defendant resides or is found or has an agent * * *." By affidavit and motion, Clayman affirms that he is a resident of New York and has never resided in the Central District of California. From the face of this averment it would appear that this court does not have jurisdiction over the person of Clayman, and that venue as to him is not properly laid here.

Plaintiffs have at no time in this proceeding disputed Clayman's affirmations. They urge only that decision of whether he is properly before this court be reserved until they may, by discovery process, ascertain whether there in fact exist any bases of jurisdiction as to him. Plaintiffs have cited no authority for the

---

1. Clayton Act §§ 4, 16, 15 U.S.C. §§ 15, 26.

2. A third employee of Buttes, Philley, was originally named as a defendant, but he has been dropped from the action by stipulation of the parties. The Buttes Company, Boreta, and Smith will occasionally be referred to collectively as "the Buttes defendants."

3. Sherman Act § 1, 15 U.S.C. § 1.

4. Sherman Act § 2, 15 U.S.C. § 2.

5. *Id.*

6. A complete statement of the facts pleaded in the complaint is reserved to the portion of this opinion dealing with the Buttes defendants' motion.

proposition that the court may continue the pendency of an action against an individual defendant, and allow him to be subjected to discovery in that capacity, where the court has before it an unrebutted showing that he is not within its personal jurisdiction. In these circumstances, this court considers it necessary to dismiss the complaint as to Clayman for want of jurisdiction over his person. *See* Hansen Packing Co. v. Armour & Co., 16 F.Supp. 784, 786–787 (S.D.N.Y. 1936). Similarly, dismissal on the ground of improper venue would appear warranted. 15 U.S.C. § 15.

Defendant Clayco urges dismissal on the grounds of lack of personal jurisdiction, improper venue, and insufficiency of service of process. These matters are governed by Section 12 of the Clayton Act, 15 U.S.C. § 22, which provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

The uncontested allegations before the court are that Clayco is a Delaware corporation, that its principal and only place of business is in New York, that it has never conducted business in this district, and that it has no officers, agents, offices, property, or other links in California or in this district. Once again, then, there appears a prima facie showing under the relevant statute that jurisdiction and venue are not here properly laid.

To overcome this showing, plaintiffs rely upon the so-called "co-conspirator"

or "*Giusti*" theory of antitrust venue— a doctrine which had its origin in the case of Giusti v. Pyrotechnic Industries, 156 F.2d 351 (9th Cir.), cert. den., Triumph Explosives v. Giusti, 329 U.S. 787, 67 S.Ct. 355, 91 L.Ed. 675 (1946). Plaintiffs' reading of *Giusti* and the cases following it is that, by virtue of an agency principle, "co-conspirators are deemed to be found or to transact business within a district under 15 U.S.C.A. § 22 when one of them is found or transacts business within the district." Defendant Clayco, in reply, questions whether the *Giusti* theory is presently tenable in any form, and, if so, whether it is as broad as plaintiffs construe it.

In the Ninth Circuit, any assessment of the possible applicability of the co-conspirator principle requires an understanding of *Giusti* itself. Examination of the decision immediately discloses that the case is not direct authority on the sweep of the Clayton Act's venue provisions. Rather, *Giusti* involved an interpretation of the service of process requirements of the California Civil Code. In holding that the out-of-state defendant had "transacted business" in California within the meaning of then section 406a of the California Civil Code,[7] the court decided first that the acts of the defendant's co-conspirators alleged in the complaint constituted "transacting business" in California, and then applied an agency principle to impute this "transacting" to the foreign defendant. 156 F.2d at 353–354.

The co-conspirator theory of "transacting business" within the meaning of Section 12 of the Clayton Act—to which *Giusti* has been said to have given "illegitimate birth"[8]—has been rejected by the only court of appeals squarely confronted with it,[9] and has (in dictum)

---

7. Presently § 6504, Cal.Corp.Code.

8. Byrnes, Bringing the Co-Conspirator Theory of Venue Up-to-Date and into Proper Perspective, 11 Antitrust Bull. 889, 892 (1966).

9. Bertha Building Corp. v. National Theatres Corp., 248 F.2d 833, 836 (2nd Cir. 1957), cert. den., 356 U.S. 936, 78 S.Ct. 777, 2 L.Ed.2d 811 (1958); *see* H. L. Moore Drug Exchange, Inc. v. Smith, Kline & French Laboratories, 384 F.2d 97, 98 (2nd Cir. 1967).

been termed "frivolous" by the Supreme Court.[10] While it has been observed, as plaintiffs herein stress, that the venue provisions for private antitrust actions are intended to give injured plaintiffs a broad choice of forum, the co-conspirator approach, allowing venue as to defendants with no direct contacts with the forum district, has frequently been rejected as an unwarranted extension, beyond the legislative purpose. *E. g.,* Bankers Life & Casualty Co. v. Holland, *supra;* Independent Productions Corp. v. Loew's, Inc., 148 F.Supp. 460, 463 (S.D.N.Y.1957); West Virginia v. Morton International, Inc., 264 F.Supp. 689, 695 (D.Minn.1967); Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., 291 F.Supp. 252, 262 (E.D.Pa.1968); Byrnes, *supra,* 11 Antitrust Bull. at 895–896. One major vice of the theory, it has been noted, is that under it a defendant could establish the claim of improper venue only after submitting to a trial on the merits. *See* West Virginia v. Morton International, *supra,* 264 F.Supp. at 695; Byrnes, *supra,* 11 Antitrust Bull. at 896.

Several of the district courts in the Ninth Circuit that have admitted co-conspirator venue under 15 U.S.C. § 22 have done so out of a belief that the result was compelled in the circuit by *Giusti* itself. *See* De Golia v. Twentieth Century-Fox Film Corp., 140 F.Supp. 316, 317 (N.D.Cal.1954); California v. Brunswick Co., 32 F.R.D. 36, 38 (N.D. Cal.1961); *cf.* Haleiwa Theatre Co. v. Forman, 37 F.R.D. 62, 65 (D.Haw.1965). But the most recent Ninth Circuit decision discussing *Giusti* in the antitrust context intimates that this is, at best, an open question. The court of appeals stated in Hayashi v. Red Wing Peat Corp., 396 F.2d 13, 15 (9th Cir. 1968):

Since appellants disavowed reliance upon acts of alleged co-conspirators within the district as affording a basis for venue, we need not consider wheth-

er Giusti v. Pyrotechnic Productions [sic], Inc., 156 F.2d 351, 354 (9th Cir. 1946) holds that venue may be established on this basis, and, if it does, whether, as appellee argues, such a holding is inconsistent with Bankers Life & Casualty Co. v. Holland, 346 U.S. 379, 383, 74 S.Ct. 145, 98 L.Ed. 106 (1953). See Bertha Bldg. Corp. v. National Theatres Corp., 248 F.2d 833 (2d Cir. 1957); H. L. Moore Drug Exchange, Inc., supra.

■ Whatever the authority of *Giusti* in the antitrust realm, careful examination of the case and of subsequent decisions explicating it discloses that its delineation of what may be deemed "transacting business" in a district by foreign co-conspirators is not as sweeping as plaintiffs assert. Plaintiffs' contention that any transacting of business in the district by a defendant may be imputed to co-conspirators—whether or not connected with the conspiracy—carries the co-conspirator rationale beyond its own logic, because one co-conspirator is deemed the agent of the others only with respect to activities in furtherance of the conspiracy. This limitation is implicit in those cases that have viewed *Giusti* as allowing venue for absent co-conspirators only when conspiratorial agreement or overt acts are alleged to have occurred within the district. *E. g.,* Ziegler Chemical & Mineral Corp. v. Standard Oil of California, 32 F.R.D. 241, 243 (N.D.Cal. 1962).

But *Giusti* itself is even more limited: in order to hold that the absent co-conspirator had transacted business within California, the court in *Giusti* not only relied upon acts of conspiracy in the state but was at pains to establish that these acts themselves constituted the transaction of business. 156 F.2d at 353–354. Thus, to come within *Giusti* the complaint must allege conspiratorial agreement or overt acts within the district that constituted the transaction of busi-

10. Bankers Life & Casualty Co. v. Holland, 346 U.S. 379, 384, 74 S.Ct. 145, 98 L.Ed. 106 (1953); *see also id.* at 385–386, 74 S.Ct. 145 (Frankfurter, Jackson, and Minton, JJ., dissenting).

ness. Several district courts have concurred in this precise reading of *Giusti*. *E. g.*, California Clippers, Inc. v. United States Soccer Football Ass'n, 314 F.Supp. 1057, 1067 (N.D.Cal.1970); West Virginia v. Morton International, *supra*, 264 F.Supp. at 694–695; Commonwealth Edison Co. v. Federal Pacific Electric Co., 208 F.Supp. 936, 942–943 (N.D.Ill.1962); Periodical Distributors, Inc. v. American News Co., 1961 Trade Cas. ¶ 70,011, at 78,008–09 (S.D.N.Y.1961).

■■ Reasoning, then, from *Giusti* as properly construed, since the instant complaint nowhere alleges as part of the conspiracy any doing of business in the Central District of California, Clayco cannot be deemed to be transacting business here. It therefore appears that both jurisdiction, *see* International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and venue, 15 U.S.C. § 22, are lacking as to Clayco. Since Clayco does not come within the terms of 15 U.S.C. § 22, service of process upon its statutory agent in Delaware pursuant to that section was insufficient as to Clayco, *see* West Virginia v. Morton International, *supra*, 264 F.Supp. at 690, and a fortiori also defective as to Clayman, who unrebuttedly affirms that he was never served personally, but rather received a copy of the complaint only in his capacity as president of the corporate defendant.

■ Plaintiffs urge, finally, that the present disposition of Clayco's motion should be held in abeyance so that they may proceed, by discovery, to attempt to bolster their claim that jurisdiction and venue are properly laid. The procedure on a motion such as the present one is within the discretion of the district court, *see* Gibbs v. Buck, 307 U.S. 66, 71–72, 59 S.Ct. 725, 83 L.Ed. 1111 (1939). Since plaintiffs have at no time during this proceeding offered any allegations that might bring them within the venue principle upon which they rely, and considering also the questionable authority of that principle, it would not appear appropriate for this court to stay its decision.

For the above-stated reasons, the motion to dismiss the complaint by Clayco Petroleum Corporation and its president, Clayman, will be granted on all three grounds asserted.

### THE BUTTES DEFENDANTS' MOTION

The Buttes defendants do not contest personal jurisdiction or venue. Rather, they urge dismissal of the complaint and action on the grounds of lack of subject matter jurisdiction, failure to state a claim upon which relief may be granted, and failure to join parties who must be deemed "indispensable" under Rule 19, Fed.R.Civ.P. Their argument is comprised of five separate legal contentions, all of which require for analysis a statement of the facts pleaded in the complaint.

Plaintiffs assert that, pursuant to their efforts to develop and exploit the petroleum reserves underlying the offshore waters of the Trucial States in the Persian Gulf, they obtained in 1969 a concession from the Ruler of Umm al Qaywayn, one of the Trucial States, granting plaintiffs the exclusive right to explore for, extract, and sell oil underlying the territorial and offshore waters of Umm al Qaywayn. It was plaintiffs' purpose to import into the United States for refining any oil extracted pursuant to this concession. Owing to the unavailability of the Suez Canal, such importation would be made through Pacific Coast seaports in California. The concession agreement is by its own terms to terminate if oil is not discovered in "commercial quantities" (Compl. ¶ 22(b)) in the concession area within four years of the concession's effective date.

Immediately prior to their obtaining the concession from Umm al Qaywayn, plaintiffs allege, defendants Buttes and Clayco had themselves unsuccessfully attempted to negotiate such a concession. Subsequent to plaintiffs' success with Umm al Qaywayn, Buttes and Clayco allegedly negotiated, in December, 1969, a comparable concession by the Ruler of

the Trucial State Sharjah, covering its territorial and offshore waters.

The mainland areas of Sharjah and Umm al Qaywayn are situated contiguously at the southeastern end of the Persian Gulf. Sharjah, moreover, asserts sovereignty to the island of Abu Musa, located 38 miles off the coast of its mainland. Plaintiffs allege that at the time defendants' concession was granted by Sharjah, it claimed a territorial waters domain of three miles, including a belt extending that distance seaward from the low water mark of Abu Musa. The territorial waters perimeter off Abu Musa allegedly constituted a boundary between the Sharjah and Umm al Qaywayn concession areas that was acknowledged by both states. A map indicating this boundary is attached to the complaint, and plaintiffs allege that confirmatory copies of this map were included in the two concession agreements when each was submitted to and approved by the British Foreign Office, pursuant to a treaty still in force between Britain and the Trucial States.

Still friendly in the beginning of 1970, plaintiffs and Buttes agreed to exchange information gleaned from seismic tests to be made of the seabed and subsoil underlying their respective concession areas. The results of plaintiffs' tests indicated the presence of oil in extensive quantities at a point within their alleged concession area nine miles seaward from the low water mark of Abu Musa. Plaintiffs proceeded to prepare to drill in this area, expending several million dollars for that purpose by the time the complaint was filed.

The complaint alleges that after learning in March, 1970 of the apparent richness of plaintiffs' concession area, defendants entered into and acted upon a conspiracy to misappropriate plaintiffs' rights to the oil underlying the Persian Gulf nine miles off Abu Musa. The execution of this conspiracy, as alleged, involved a multi-faceted international intrigue whose detail, relevant to the grounds of the instant motion to dismiss, is set out in the margin in the words of the complaint.[11] Briefly

---

11. "22. Plaintiffs are informed and believe and thereon allege that to that end and for that purpose, defendants combined and conspired with each other to do, and pursuant to said combination and conspiracy did, among others, the following acts under the following circumstances:

"(a) Undertook falsely to claim and fraudulently to appropriate, under color of their aforesaid agreement with the Ruler of Sharjah, all exploratory rights anywhere within an area bounded by a line twelve nautical miles seaward from the low water mark on the island of Abu Musa, notwithstanding the rights previously granted plaintiffs up to a line only three miles seaward from Abu Musa.

"(b) The agreement granting the Occidental concession provides, in part, that if petroleum in commercial quantities is not discovered within four years of its effective date, the agreement shall terminate and be of no further force or effect. Defendants, knowing of this provision and for the purpose of causing the Occidental concession to lapse, on or about March 25, 1970, acting through Buttes, submitted to the British Political Agent in the Trucial States for approval, in accordance with the treaty mentioned in paragraph 16 above, plans prepared in

the United States for drilling for oil and gas by Buttes for itself and Clayco at a location which defendants well knew was wholly within the area of the Occidental concession and wholly outside the area of the concession granted Buttes and Clayco by the Ruler of Sharjah. The British Political Agent rejected said plans.

"(c) Defendants then induced the Ruler of Sharjah, for his own personal gain and benefit, to protest the rejection by the British Political Agent of the aforesaid plans of Buttes and falsely to assert and claim that the location therein specified was within the concession area granted to Buttes and Clayco by him.

"(d) Defendants further induced and procured the Ruler of Sharjah to present, in support of his assertion and claim, a decree purporting to have been made prior to the grant of the Occidental concession, but in fact prepared after said concession was granted, wherein and whereby the Ruler of Sharjah asserted in substance and effect that the territorial waters of Sharjah, its dependencies and islands extended twelve nautical miles seaward from their low water lines. Said decree was in effect an attempted confiscation, without compensation, of plaintiffs' vested property rights in the oil and gas to

stated, after unsuccessfully submitting to the British Political Agent in the Trucial States a plan whereby Buttes would drill for oil in a portion of the Occidental-Umm al Qaywayn concession area, defendants "induced and procured" the Ruler of Sharjah to claim ownership of the oil-rich portion of plaintiffs' concession area by preparing and submitting to the British Agent a concession amendment and two decrees, one of the latter fraudulently backdated to represent that

which they were entitled under the aforesaid agreement between Occidental of Umm Al Qaywayn, Inc., and the Ruler of Umm Al Qaywayn, in violation of international law, which defendants arranged to have issued for the purpose of eliminating plaintiffs from competition with them in the exploration and production of oil from the seabed underlying the offshore waters of the Trucial States. Neither said purported decree nor any claim of the Ruler of Sharjah such as that made therein, had theretofore been published or otherwise made known by the Ruler of Sharjah to the British Foreign Office, the British Political Agent in the Trucial States, the Ruler of Umm Al Qaywayn, or any of the rulers of the other Trucial States; in fact, in 1964 the Ruler of Sharjah had signed a statement acknowledging his offshore right to extend only to three miles seaward from Abu Musa.

"(e) The British Political Agent in the Trucial States rejected the protest and the decree of the Ruler of Sharjah and thereupon Buttes and Clayco induced and procured the Ruler of Sharjah, on or about April 2, 1970, to designate and appoint as his legal advisor in the matter one of the attorneys for Buttes and Clayco.

"(f) On or shortly after April 2, 1970, Buttes and Clayco and the Ruler of Sharjah submitted to the British Foreign Office for approval a purported amendment of the aforementioned agreement between them, which amendment purported to extend Buttes' and Clayco's drilling rights to a line twelve nautical miles seaward from the low water lines of Sharjah, its dependencies and islands, all in violation of international law and of the rights of the plaintiffs, as aforesaid.

"(g) Defendants induced and procured the Ruler of Sharjah to issue and publish a second purported decree dated April 5, 1970, purporting to supplement the aforementioned decree which had purported to have been made prior to the granting of the Occidental concession, which second decree attempted to appropriate the Occidental concession in violation of international law.

"(h) On May 16, 1970, after recommending the refusal of permission to Buttes and Clayco to drill outside their concession area, the British Foreign Office, pursuant to the treaty and undertaking set forth in paragraph 16 above, requested the Ruler of Sharjah to take no action to give effect to his aforementioned decrees and to make no further decrees and notified said Ruler that operations by plaintiffs were to proceed on the basis of the concession agreement as originally signed between the Ruler of Umm Al Qaywayn and Occidental of Umm Al Qaywayn, Inc. Thereupon, in the latter part of May 1970, defendants induced and procured the National Iranian Oil Company to assert at this time that the island of Abu Musa was Iranian territory and that the territorial waters of Iran in respect of such island extend to a line twelve nautical miles seaward from its low water mark.

"(i) In the latter part of May 1970, defendants induced and procured personnel of the British Foreign Office to request of plaintiffs that they not commence drilling operations, which they were then prepared to commence, until June 1, 1970, pending the resolution of the claims of the Ruler of Sharjah and the National Iranian Oil Company with respect to the island of Abu Musa and its territorial waters, which said claims defendants had caused to be made in pursuance of their intent as aforesaid.

"23. Beginning May 27, 1970, plaintiffs' personnel and equipment, standing ready near the Occidental concession to commence drilling operations, were menaced and threatened by armed surface ships and airplanes of the British Armed Forces. On June 1, 1970, plaintiffs' seagoing equipment was boarded under force by the British Royal Navy. On June 3, 1970, over his protest and acting under the threat of exile, and after his home had been buzzed by airplanes of the British Royal Air Force and surrounded by British soldiers, the Ruler of Umm Al Qaywayn directed plaintiffs not to drill in the area claimed to be within the territorial waters of Sharjah and Iran. Plaintiffs were forced to abandon indefinitely their plans to commence drilling operations.

prior to the granting of plaintiffs' concession by Umm al Qaywayn, Sharjah had claimed territorial waters extending *twelve* miles seaward from the low water mark of its territory, including Abu Musa. These representations did not convince the British Foreign Office, which ordered the Ruler of Sharjah to desist and acknowledged the authority of the Occidental-Umm al Qaywayn concession. Defendants allegedly then enlisted the aid of other sovereigns: they "induced and procured" the National Iranian Oil Company, in May, 1970, to claim Iranian sovereignty over Abu Musa and the waters twelve miles seaward therefrom; and defendants thereafter further "induced and procured" the British Foreign Office to request that plaintiffs refrain from their imminent drilling operations until the claims of Sharjah and of the Iranian Company could be resolved. British ships and aircraft menaced plaintiffs' personnel and equipment on the drilling site, and on June 1, 1970, members of the Royal Navy forcibly boarded plaintiffs' equipment.[12] Two days later the Ruler of Umm al Qaywayn directed plaintiffs not to drill in the disputed area; this order, which had the effect of suspending plaintiffs' intended drilling operations under their concession, was allegedly the consequence of threats of exile and acts of military intimidation by British forces made to the Ruler of Umm al Qaywayn. The threats against the Ruler of Umm al Qaywayn, and his order to plaintiffs, were allegedly "direct consequences, fully intended and expected by the defendants, of the conflicting and fraudulent claims with regard to the island of Abu Musa and its territorial waters, which the defendants had induced and procured." (Compl. ¶ 24). The intended upshot of this intrigue, the complaint alleges, is that following the withdrawal of the British from the Persian Gulf area in 1971 defendants will arrange with the Ruler of

Sharjah to extract oil and gas from areas covered by plaintiffs' concession.

To remedy the injury suffered from this conspiracy, the plaintiffs request treble their damages of $100 million—the estimated worth of the oil in the concession area—as well as extensive equitable relief, to wit, an injunction restraining defendants or any persons operating in concert with them from disputing the validity of the Occidental concession as alleged in the complaint, from interfering with plaintiffs' operations in the waters of the Trucial States, and from extracting oil from the area of the Occidental concession; in the alternative to this last demand, plaintiffs request the impressment of a trust for their benefit upon any revenues derived by defendants or those acting for them from any part of the plaintiffs' concession area.

The Buttes defendants urge five arguments to defeat the complaint. First, they assert that this court lacks jurisdiction of the subject matter of the action under the antitrust laws because the complaint fails to allege a substantial anti-competitive effect upon United States commerce. Second, defendants urge, subject matter jurisdiction is lacking because the complaint sets forth an international boundary dispute, which is not amenable to decision in the courts of the United States. Third, defendants claim that Sharjah, Umm al Qaywayn, Iran, and Great Britain are parties whose joinder is necessary under Rule 19 (a) of the Federal Rules of Civil Procedure, and without whose presence the action should be dismissed pursuant to section (b) of Rule 19—in more traditional language, that the four sovereigns are "indispensable" to the action. Fourth, the defendants contend that since the complaint attacks activities undertaken to influence governmental conduct, this case is not within the subject matter of the antitrust laws, as inter-

12. The same day, Occidental of Umm al Qaywayn, Inc., filed suit in Britain against the British government, seeking declaratory relief and damages as a result of this naval episode.

**102**

preted by the Supreme Court in Eastern R. R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Fifth and finally, defendants argue that because the conspiracy and damage complained of are based upon the conduct of several sovereigns, this court is barred from adjudicating plaintiffs' claims by the act of state doctrine.

### Effect on American Commerce

■ The Buttes defendants first contend that jurisdiction of this case requires "a substantial anti-competitive effect on American commerce," and that such an effect has not been demonstrated by the complaint. On this basis the court is urged to dismiss the complaint for want of subject matter jurisdiction.

The trade and commerce allegedly restrained in this case involved plaintiffs' intended extraction and importation of oil from the territorial waters of the Trucial States. It would therefore appear that the case is governed by the standards of jurisdiction applicable to restraints of "foreign commerce." [13]

That *some* effect on our foreign commerce is a prerequisite to jurisdiction is evident from the text of the antitrust statutes here involved.[14] Defendants assert that the effect must be "a substantial anti-competitive" one. They rely on

the following language from the 1955 Report of the Attorney General's National Committee to Study the Antitrust Laws, at 76:

> We feel that the Sherman Act applies only to those arrangements between Americans alone, or in concert with foreign firms, which have such substantial anti-competitive effects on this country's "trade or commerce * * * with foreign nations" as to constitute unreasonable restraints.

But this quotation seemingly states the criterion for a Sherman Act *violation.* "Substantial anti-competitive effect" is used, in the above text, to qualify "unreasonable restraints"; and it is only unreasonable restraints that Section 1 of the Sherman Act condemns. Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). *See* Beausang, The Extraterritorial Jurisdiction of the Sherman Act, 70 Dick.L.Rev. 187, 191 (1966): "An 'affect' is a necessary element of *jurisdiction* * * *; a direct and substantial 'affect' is necessary for Sherman Act *violations.* The problem arises when the standards of illegality (which might be modified to promote foreign trade) are confused with the jurisdictional feature of the 'affect on foreign commerce'" (emphasis in original).

In reviewing the cases, Von Kalinowski notes the confusion evident therein:

> The cases that used the word "affect" have said that a restraint must (1)

13. For this reason Page v. Work, 290 F.2d 323 (9th Cir.), cert. den., 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76 (1961), and David Cabrera, Inc. v. Union de Choferes y Duenos de Camiones Hermanados de Puerto Rico, 256 F.Supp. 839 (D.P.R.1966), relied upon by defendants, are inapposite. The standard of "substantial effect" laid down in those cases defines antitrust jurisdiction over restraints of *intrastate*, as *contrasted* with interstate, business. *See also* Lieberthal v. North Country Lanes, 332 F.2d 269 (2nd Cir. 1962); 1 J. Von Kalinowski, Antitrust and Trade Regulation § 5.01 [4], at 5–98—102 (1969).

14. *Compare* Sherman Act § 1, 15 U.S.C. § 1 ("Every contract * * * in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *.") *and* Sherman Act § 2, 15 U.S.C. § 2 ("Every person who shall monopolize * * * any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *.") *with* Clayton Act §§ 4, 16, 15 U.S.C. §§ 15, 26 (incorporating by reference the former two sections).

"directly affect," or (2) "substantially affect," or (3) "directly and substantially affect," or (4) simply "affect" the flow of foreign commerce.

1 J. Von Kalinowski, *supra,* § 5.502[2], at 5–120 (footnotes omitted). He concludes that "[t]he better view would seem to be that any effect that is not both insubstantial and indirect will support federal jurisdiction under Section 1." *Id.* at 5–121—22.

■ The interference with plaintiffs' business of extracting and importing oil into the United States, alleged in the complaint, is certainly a "direct" effect on our foreign commerce.[15] On this basis, the court is disposed to hold that the complaint alleges a sufficient effect on foreign commerce. Moreover, since the standard urged by defendants is largely coterminous with the scope of proof required to establish plaintiffs' section 1 case on the merits, dismissal now on the grounds that that standard has not been met would be premature. In urging dismissal, defendants stress such factors as the smallness of the Buttes Company in relation to plaintiff Occidental Petroleum Corporation, the confined geographical area of plaintiffs' concession, the presently speculative value of that concession, and the presence in the Persian Gulf of numerous other companies extracting oil for importation into the United States. These are matters that would appear to bear upon proof of plaintiffs' claims of antitrust violations; they cannot serve at this stage to defeat jurisdiction.

*Boundary Dispute*

The remaining points of the Buttes defendants' motion reflect the unconventional nature of this lawsuit, as one arising out of the claims and acts of a number of foreign states. The initial and broadest contention posed respecting these circumstances is that the complaint demands that the court decide the boundary dispute pending between the two Trucial States whose concessionaires are the principal parties to this case; therefore, defendants say, the complaint fails for want of subject matter jurisdiction.

■ The determination of foreign states' boundaries is certainly not a permissible function of this court. In our system, the questions of what are a country's boundaries, or of what nation has sovereignty over a certain piece of territory, are not for the judiciary to decide; they are political questions, upon which the courts must be guided and bound by the pronouncements of the executive. Williams v. Suffolk Insurance Co., 38 U.S. (13 Pet.) 415, 10 L.Ed. 226 (1839); Cheng Fu Sheng v. Rogers, 177 F.Supp. 281 (D.D.C.1959), rev'd on other grounds, 108 U.S.App.D.C. 115, 280 F.2d 663, cert. den., 364 U.S. 891, 81 S. Ct. 222, 5 L.Ed.2d 187 (1960); *see* Jones v. United States, 137 U.S. 202, 11 S.Ct. 80, 34 L.Ed. 691 (1890). Authoritative judicial resolution of international boundary disputes is a function not of domestic courts, but of international tribunals, acting upon the consent of the contestant states. *See generally* A. Cukwurah, The Settlement of Boundary Disputes in International Law (1967).[16]

15. The Buttes defendants read the complaint as charging, at worst, that Buttes and Clayco, rather than plaintiffs, would obtain and import any oil derived from the disputed portion of the plaintiffs' concession. From this they reason that *no* effect on American commerce is shown, because the oil would at all events enter the stream of commerce. This argument begs the issue. When control of an item in commerce is wrested from one competitor by another, the commerce of the article is to that extent "affected," regardless of the ultimate disposition of the commodity.

16. Along similar lines, mediation has been instituted to attempt a resolution of the instant dispute between Sharjah and Umm al Qaywayn. As presented to this court in an exhibit, the terms of reference for the mediator—who is to be appointed by the British government—specify as one point of contention the respective rights of the oil concessionaires, parties to this case. The terms of refer-

Defendants stress that the plaintiffs demand an injunction protecting their rights to extract oil from the area claimed by Sharjah and Umm al Qaywayn. Since these rights are derived from Umm al Qaywayn, it is reasoned, decision for plaintiffs would require this court to decide the territorial dispute in favor of that state. Moreover, such an adjudication would allegedly establish, by effect and by implication, the superiority of Umm al Qaywayn's claim over that of Sharjah. For these reasons defendants say that the complaint demands decision of an international boundary dispute.

These arguments underscore some important aspects of this case. It is true that the adjudication and order requested by plaintiffs would determine against Sharjah's concessionaires what is apparently the major stake of the pending international dispute—the right to extract oil from the disputed area off Abu Musa. Moreover, the establishment of plaintiffs' claims would involve a finding that Sharjah attempted to usurp Umm al Qaywayn's acknowledged rights to the disputed area. The concerns aroused by these aspects of the case are, however, more appropriately addressed by succeeding points of this motion, dealing with "indispensable parties" and the act of state doctrine.

Although the factual setting and the relief demanded in this case center around the territorial dispute between Sharjah and Umm al Qaywayn, the complaint does not require an explicit or implicit adjudication of those states' rights to the disputed territory. Plaintiffs seek, essentially, to prove a conspiracy, unlawful under the antitrust laws, in the clouding of the boundary question, and to remedy the injury done them by that conspiracy. Their claim is, as it were, framed in tort rather than as a suit to quiet title. Absent is any requirement that this court undertake a determination of foreign boundaries—a task that the court is admittedly neither suited nor authorized to pursue.[17] The instant ground of the motion to dismiss must be denied.

### "Indispensable Parties"

The Buttes defendants next assert that Sharjah, Umm al Qaywayn, Great Britain, and Iran are, in the traditional language, "indispensable parties" to this case. This question is governed by Rule 19 of the Federal Rules of Civil Procedure, which was drastically rewritten in 1966. The present terms of Rule 19 [18] demand a two-step inquiry:

ence further prescribe that the mediator is to enjoy the assistance of these oil companies. Iran is apparently not a party to this mediation.

17. Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 461 & n. 20, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (White, J., dissenting).

18. Rule 19 provides as follows:
Joinder of Persons Needed for Just Adjudication
(a) *Persons to be Joined if Feasible.* A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the ac-

tion in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

(b) *Determination by Court Whenever Joinder not Feasible.* If a person as described in subdivision (a) (1)—(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action

first, is the party one who should be "joined if feasible," within the terms of paragraph (a) of the Rule; and second, if he is but he cannot be made a party, should the action "in equity and good conscience" be dismissed, pursuant to the terms of paragraph (b). Particularly as presently rewritten, Rule 19 directs a pragmatic analysis, not just one dictated by the application of formal categories. Note of the Advisory Committee on Civil Rules, 39 F.R.D. 69, 90–93 (1966); *see* Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv.L.Rev. 356, 363, 367 (1967). The rule instructs the court to look into the actual practical effects a judgment may have upon the absent party and those who are present as parties.

Defendants' primary arguments concern the alleged "indispensability" of Sharjah. That state indeed has interests that could be affected by relief that plaintiffs request. Defendants assert that the contract between Sharjah and Buttes-Clayco covers part of the area that plaintiffs claim under their concession with Umm al Qaywayn. If so, Sharjah's contractual rights stand to be abridged by an injunction restraining her concessionaires from operating in any part of the area claimed by plaintiffs. A similar adverse effect on Sharjah's contractual expectancy would accrue from the imposition of a trust that disgorged from defendants all revenues obtained from drilling in the area, including the proceeds they were obligated to pay to Sharjah.[19] In sum, to paraphrase Rule 19(a) (2) (i), Sharjah claims an interest relating to the subject of the action—the "subject of the action" being operations by Buttes-Clayco in any part of plaintiffs' alleged concession area—and a disposition in Sharjah's absence may impair or impede its ability to protect that interest.

At the same time, were an injunction issued or a trust set up that did not bind Sharjah, Buttes and Clayco would risk incurring inconsistent obligations, under the court's order on the one hand and under their contract with Sharjah on the other. This risk is another criterion warranting the joinder of Sharjah. Rule 19(a) (2) (ii).

From the above analysis, it appears that Sharjah is a "person to be joined if feasible" under Rule 19(a). *See* McConnell v. Dennis, 153 F. 547 (8th Cir. 1907). Plaintiffs oppose this result, however, on the ground that Sharjah (as well as Umm al Qaywayn, Iran, and Great Britain) is a co-conspirator or joint tortfeasor. It has been held generally that antitrust co-conspirators need not be joined, *e. g.*, Georgia v. Pennsylvania

---

should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

(c) *Pleading Reasons for Nonjoinder.* A pleading asserting a claim for relief shall state the names, if known to the pleader, of any persons as described in subdivision (a) (1)—(2) hereof who are not joined, and the reasons why they are not joined.

(d) *Exception of Class Actions.* This rule is subject to the provisions of Rule 23.

19. It has not been made clear whether this is the intent of plaintiffs' request that "a trust be impressed, for the benefit of plaintiffs, on all revenues derived by the defendants and by any and all persons acting directly or indirectly for or on their behalf, or for or on behalf of [any] of them," Compl., Prayer ¶ 1(c), or whether this constructive trust demand envisions that Sharjah's share of the revenues be left alone. The latter approach, as noted below, would alleviate the prejudice to Sharjah and to defendants.

R.R., 324 U.S. 439, 463, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); similarly, for "a tortfeasor with the usual 'joint-and-several' liability," Advisory Committee's Note, *supra*, 39 F.R.D. at 91. However, these principles must be applied in context. In the present case, Sharjah's status as a joint tortfeasor would not as a practical matter negate its status as a contractual party, with interests that are covered by Rule 19(a).[20]

Assuming that joinder of Sharjah is impossible, because of sovereign immunity or lack of personal jurisdiction,[21] it must next be determined, pursuant to Rule 19(b), whether the case should continue in Sharjah's absence—i. e., whether that state is, in fact, "indispensable."

From among the factors enumerated in Rule 19(b) to aid the court in making this determination, "the shaping of relief" would afford means to avert the dilemma posed by Sharjah's contractual rights. For example, a constructive trust decree could be framed that left intact the share of the oil proceeds to which Sharjah was entitled under its concession. Under such an approach the prejudice to Sharjah (loss of oil rights) and to Buttes and Clayco (possible suit by Sharjah) could be "lessened or avoided," Rule 19(b). A comparable result would obtain if the court refrained from awarding any equitable relief, but instead proceeded only with plaintiffs' claim for damages. *See* Advisory Committee's Note, *supra*, 39 F.R.D. at 92.

With these alternatives available, it becomes evident that Sharjah is not an "indispensable" party to this case.

More easily resolved are defendants' assertions that Umm al Qaywayn, Iran, and Great Britain are "indispensable." With respect to Iran and Umm al Qaywayn, defendants' contentions are based essentially on the premise that the present suit will decide which state holds sovereign rights over the disputed Persian Gulf territory. But it has been determined above that title to the disputed area is *not* the subject of this action. As regards Great Britain, defendants stress that that country exercises supervisory power over the international relations of the Trucial States, and that in this capacity it has acted to prevent plaintiffs from drilling for oil in the disputed area. These facts apparently are adduced to indicate that Britain is a party in whose absence disposition of the case would be "incomplete" or "hollow,"[22] as prescribed in paragraph (a) (1) (i) of Rule 19. While this might be true with respect to the injunction sought by plaintiffs—because Britain would still be free to restrain their operations—that does not mean that the suit must be dismissed. *Cf.* United States v. National Lead Co., *supra*, 63 F.Supp. at 525 and n. 8. The court has the power to issue a monetary decree instead of an injunction; and it cannot be denied that a money judgment against the defendants would constitute "com-

**20.** There is authority to the effect that an antitrust suit will not be dismissed even in the absence of a co-conspirator whose contractual rights are directly challenged by the adjudication, or in any event stand to be adversely affected by it. Martin v. Chandler, 85 F.Supp. 131 (S.D.N.Y.1949); *see* United States v. National Lead Co., 63 F.Supp. 513, 525 & n. 8 (S.D.N.Y.1945), aff'd, 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947); *contra*, Bond v. Harris, 239 F.Supp. 427 (S.D.N.Y.1964). The cases so holding apparently reflect the general doctrine that the courts will proceed to enforce "public rights" even where the contractual rights of absent parties are as a result jeopardized. *See* National Licorice Co. v.

NLRB, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799 (1940); SEC v. Royal Hawaiian Management Corp., No. 67–546–F (C.D.Cal., June 12, 1967). In the present case, however, the fact that the absent co-conspirator is a foreign country could present countervailing considerations against the court's obstructing or countermanding the performance of a contract with it. *Cf.* Note, Extraterritorial Application of the Antitrust Laws, 69 Harv.L.Rev. 1452, 1459–1461 (1956).

**21.** *See, e. g.*, Zwack v. Kraus Bros. & Co., 237 F.2d 255, 259 (2nd Cir. 1956).

**22.** Advisory Committee's Note, *supra*, 39 F.R.D. at 91.

plete relief * * * accorded among those already parties," Rule 19(a) (1).

Sharjah, Umm al Qaywayn, Iran and Great Britain are not "indispensable parties," and the action need not be dismissed pursuant to Rule 19, Fed.R.Civ. P.

### Foreign Government Action

The final two points of this motion are addressed to the peculiar nature of the conspiracy alleged in this case. As detailed above, the defendants are charged, exclusively, with "inducing and procuring" assorted executive acts by foreign states; and it is plainly these acts that allegedly have caused and threatened to cause the damage plaintiffs seek to remedy. The Buttes defendants contend that the foregoing circumstances preclude the court from adjudicating this case. Two doctrines are relied upon: the limitation of antitrust jurisdiction articulated in Eastern R. R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and the rule of judicial abstention known as the act of state doctrine. The two rules spring from different considerations.

In *Noerr*, the Supreme Court unanimously decided that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." 365 U.S. at 136, 81 S. Ct. at 529. This interpretation of the Sherman Act was reaffirmed, with further elucidation,[23] in United Mine Work-

ers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Since *Noerr* and *Pennington* construed the Sherman Act with reference to influencing American state and federal officials, the threshold question here is whether the teaching of those cases is applicable when foreign governments are involved.

There is no direct authority on this question. The Buttes defendants, however, contend that *Noerr* was implicitly extended to cover the solicitation of foreign governments, in Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). *Continental Ore* was an antitrust case in which a subsidiary of Union Carbide had allegedly boycotted the plaintiff in the course of exercising discretionary authority as the purchasing agent of the Canadian government. The Court distinguished *Noerr* on ground that "[r]espondents were engaged in private commercial activity, no element of which involved seeking to procure the passage or enforcement of laws." 370 U.S. at 707, 82 S.Ct. at 1415.[24] Defendants insist that in distinguishing *Noerr* only on its facts, the Court in *Continental Ore* decided sub silentio that the rule of *Noerr* would have applied had there been solicitation of foreign government action. At least one commentator agrees precisely.[25] However, an at least equally tenable interpretation of *Continental Ore* is that the Court deemed it unnecessary, in view of the facts, to decide the legal question at all.

▮▮▮▮ Examination of the premises underlying *Noerr* indicates that the

23. In reversing the decision below, the Court in *Pennington* reaffirmed that "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." 381 U.S. at 670, 85 S.Ct. at 1593; accord, *Noerr, supra*, 365 U.S. at 138–140, 81 S.Ct. 523. The Court went on to state that "[s]uch conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." 381 U.S. at 670, 85 S.Ct. at 1593.

24. In *Pennington* the Court similarly distinguished *Continental Ore*, emphasizing that "[t]he purchasing agent * * * was not a public official but the wholly owned subsidiary of an American corporation alleged to be a principal actor in the conspiracy." 381 U.S. at 671 n. 4, 85 S.Ct. at 1594.

25. Graziano, Foreign Governmental Compulsion as a Defense in United States Antitrust Law, 7 Va.J.Int'l L. 100, 132 (1967).

case's rationales do not readily fit into a foreign context, such as the facts of this case. One of the roots of the *Noerr* decision was a desire to avoid a construction of the antitrust laws that might trespass upon the First Amendment right of petition. 365 U.S. at 138, 81 S. Ct. 523. The constitutional freedom "to petition the Government" carries limited if indeed any applicability to the petitioning of foreign governments.[26] A second basis of *Noerr* is a concern with insuring that, "[i]n a representative democracy such as this," law-making organs retain access to the opinions of their constituents, unhampered by collateral regulation. 365 U.S. at 137, 81 S.Ct. 523, 529. *Noerr* has been held inapplicable to situations in which this relationship has not been deemed threatened. *See* George R. Whitten, Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25, 32–33 (1st Cir. 1970); Trucking Unlimited v. California Motor Transport Co., 432 F.2d 755, 758 (9th Cir. 1970); Woods Exploration & Producing Co., Inc. v. Aluminum Co. v. America, 438 F.2d 1286, 1296 (5th Cir. 1971); Sacramento Coca-Cola Bottling Co., Inc. v. Chauffeurs, Teamsters and Helpers Local No. 150, 440 F.2d 1096, 1099 (9th Cir. 1971). The persuasion of Middle Eastern states alleged in the present case is a far cry from the political process with which *Noerr* was concerned.

In sum, the interests asserted in this case are dissimilar to those that Noerr was concerned with safeguarding; therefore, the wholesale application of that exception to the Sherman Act appears inappropriate. However, other considerations become prominent when acts of foreign governments are brought to bar —considerations reflecting a prudent allocation of competence between the American judiciary and executive in the field of foreign relations. The act of state doctrine is the relevant and dis-

positive principle on this motion to dismiss.

■ In Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897), the Supreme Court first definitively held that "the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." This "classic American statement of the act of state doctrine" was reaffirmed by the court most recently in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 416–418, 84 S.Ct. 923, 934, 11 L.Ed.2d·804 (1964). In the *Sabbatino* case, the bases of the doctrine were at last explicitly elaborated. The act of state doctrine, it was held, is not required by international law. 376 U.S. at 421–422, 84 S.Ct. 923. Nor is it compelled by notions of sovereign authority, although they "do bear upon the wisdom of employing" it. *Id.* Finally, the doctrine is not required by the Constitution. 376 U.S. at 423–424, 84 S.Ct. 923.

The act of state doctrine does, however, have "constitutional" underpinnings. It arises out of the basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations. The doctrine as formulated in past decisions expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere. 376 U.S. at 423, 84 S.Ct. at 938. In sum, the doctrine is a reflection of the executive's primary competency in foreign affairs, and an acknowledgment of the fact that in passing upon foreign

---

26. One authority extracts from *Noerr* and *Continental Ore* the notion that the antitrust laws do not apply to petitioning a *democratic* government. P. Areeda, Antitrust Analysis ¶ 187 & n. 206 (1967).

This interpretation, not presently adopted herein, would in any event not cover much of the conduct alleged in the instant complaint.

governmental acts the judiciary may hinder or embarrass the conduct of our foreign relations. *See* 376 U.S. at 427–428, 431–433, 84 S.Ct. 923.

Consideration of the act of state doctrine's relevance to the present case begins with one of the early act of state cases, American Banana Co. v. United Fruit Co., 160 F. 184 (C.C.S.D.N.Y.), aff'd, 166 F. 261 (2nd Cir. 1908), aff'd, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909). The facts of that case are strikingly similar to those now before the court. A private defendant was sued under the Sherman Act for destruction of plaintiff's fledgling banana business in Panama and Costa Rica. The gravamen of the complaint was that the defendant had instigated and procured Costa Rican soldiers to seize and maintain control of plaintiff's plantation and supplies. The trial court dismissed the complaint, stating, "[i]t is impossible to adjudicate this matter without sitting in judgment on the right of Costa Rico [sic] to do what was done * * * this court has no power to sit in judgment on the validity or legality of the act of any sovereign independent nation." 160 F. at 188. The circuit court of appeals affirmed, using the following language:

> Upon principle and authority, it follows that Costa Rica is entitled to immunity from any investigation of its sovereign acts by this court. The plaintiff, however, asserts that this immunity is only an immunity from suit which has no bearing upon the

defendant's liability. But, as we have seen, the immunity is far broader than this. The validity of an act adopted by a sovereign state cannot be inquired into at all—directly or collaterally—by the courts of another state. Relief must be sought in the courts of the former state or through diplomatic channels. 166 F. at 266.

On certiorari, the result was the same, Justice Holmes writing:

> The substance of the complaint is that, the plantation being within the de facto jurisdiction of Costa Rica, that state took and keeps possession of it by virtue of its sovereign power. But a seizure by a state is not a thing that can be complained of elsewhere in the courts. * * *

and then citing Underhill v. Hernandez (as had the two lower courts). 213 U.S. at 357–358, 29 S.Ct. at 513.

■ The significance of the *American Banana* case has been somewhat obscured by virtue of the fact that Justice Holmes's opinion expounds at some length a restrictive view of Sherman Act jurisdiction, based upon the situs of primary conduct.[27] This aspect of the opinion has been distinguished in subsequent international antitrust cases, e. g., United States v. Sisal Sales Corp., 274 U.S. 268, 276, 47 S.Ct. 592, 71 L.Ed. 1042 (1927); Continental Ore Co. v. Union Carbide & Carbon Corp., *supra*, 370 U.S. at 704–705, 82 S.Ct. 1404. But as those two cases intimate,[28] and as other analy-

---

27. The more modern notion that Sherman Act jurisdiction may be grounded on effects in the United States or upon its commerce does not appear on the face of the opinion, but the general interpretation has been to regard the case as one in which no such jurisdictional facts were presented. *See* Steele v. Bulova Watch Co., 344 U.S. 280, 288, 73 S.Ct. 252, 97 L.Ed. 252 (1952); W. Fugate, Foreign Commerce and the Antitrust Laws 30–31 (1958).

28. Both the *Sisal Sales* and *Continental Ore* cases steer clear of attaching antitrust liability to sovereign conduct or its inducement. The conspiracy attacked in

*Sisal Sales* included not only the procurement of favorable foreign laws but also traditional independent market activity, and the Court noted the distinction, in the same breath with its holding distinguishing the "territorial" aspect of *American Banana*—"The United States complain * * * not merely of something done by another government at the instigation of private parties. True, the conspirators were aided by discriminating legislation, but by their own deliberate acts, here and elsewhere, they brought about forbidden results within the United States." 274 U.S. at 276, 47 S.Ct. at 594; *see* the dissenting opinion of Biggs, C. J., in Noerr Motor Freight v. Eastern

ses clearly establish,[29] the holding of *American Banana* that has endured is that the act of state doctrine bars a claim for antitrust injury flowing from foreign sovereign acts allegedly induced and procured by the defendant. This holding would appear directly to control the present case.

Plaintiffs say that they do not complain of the acts of foreign states set forth in the complaint, but rather only of defendants' conduct in "catalyzing" those acts. This construction of the case is at odds with plaintiffs' papers in at least two crucial respects. In the first place, plaintiffs have in another phase of this motion dubbed the states involved in the present Persian Gulf controversy as co-conspirators. The implication to be drawn from this allegation is that plaintiffs do question the conduct of those states under the antitrust laws—an inquiry which the act of state doctrine surely bars. Second, the complaint charges that several of Sharjah's acts were violative of international law. This claim, too, is barred from American courts by the act of state doctrine—specifically by the *Sabbatino* decision. *See* 376 U.S. at 428, 430–431, 84 S.Ct. 923, 11 L.Ed.2d 804. Indeed, this portion of plaintiffs' pleading appears designed expressly to avoid the anticipated effect of the doctrine, by invoking an excep-

tion to it, which will be discussed shortly.

■ There is, moreover, a further dimension to this case's implication of foreign acts of state. Because a private antitrust claim requires proof of damage resulting from forbidden conduct, *e. g.*, Foster & Kleiser Co. v. Special Site Sign Co., 85 F.2d 742, 750–751 (9th Cir. 1936), cert. den., 299 U.S. 613, 57 S.Ct. 315, 81 L.Ed. 452 (1937); Winckler & Smith Citrus Products Co. v. Sunkist Growers, Inc., 346 F.2d 1012, 1014 & n. 1 (9th Cir.), cert. den., 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965), plaintiffs necessarily ask this court to "sit in judgment" upon the sovereign acts pleaded, whether or not the countries involved are considered co-conspirators. That is, to establish their claim as pleaded plaintiffs must prove, *inter alia*, that Sharjah issued a fraudulent territorial waters decree, and that Iran laid claim to the island of Abu Musa at the behest of the defendants.[30] Plaintiffs say they stand ready to prove the former allegation by use of "internal documents." But such inquiries by this court into the authenticity and motivation of the acts of foreign sovereigns would be the very sources of diplomatic friction and complication that the act of state doctrine aims to avert. *See Sabbatino, supra,* 376 U.S. at 423–424, 431–433, 84 S.Ct. 923.[31]

R. R. Presidents Conference, 273 F.2d 218, 226 (3rd Cir. 1959), rev'd, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). In *Continental Ore*, the Court was careful to find that the Canadian government had neither approved nor compelled any of the challenged anti-competitive actions taken by a co-conspirator while exercising discretionary powers granted by that government. 370 U.S. at 706–707, 82 S.Ct. 1404, *cf.* 370 U.S. at 707–708, 82 S.Ct. 1404, discussed *supra*. These cases, which based liability on market conduct in the context of governmental permission, do not help plaintiffs here, for the conspiracy presently pleaded is made up exclusively of the inducement of sovereign acts. *See* 1 J. Von Kalinowski, *supra*, § 5.02[3] [b].

29. *E. g.*, Steele v. Bulova Watch Co., 344 U.S. 280, 288, 73 S.Ct. 252, 97 L.Ed. 252

(1952); Fugate, Antitrust Jurisdiction and Foreign Sovereignty, 49 Va.L.Rev. 925, 926, 930, 932 (1963).

30. Plaintiffs contended at one point that the claim by the National Iranian Oil Company (Compl. ¶ 22(h)) was the act of a private commercial entity; but they later acknowledged that the claim was made on behalf of Iran, and by an instrumentality of that nation. *See* Waldron v. British Petroleum Co., 231 F. Supp. 72, 77 (S.D.N.Y.1964).

31. *Compare* the characterization of the doctrine in Frazier v. Foreign Bondholders Protective Council, 283 App.Div. 44, 125 N.Y.S.2d 900, 903 (1953): "It is a doctrine born of expediency, nourished in the council halls of nations as well as the courts of justice. Its dominant motif is political. It has gained stature in the

Instructive precedent for the present issues is found in Frazier v. Foreign Bondholders Protective Council, 283 App. Div. 44, 125 N.Y.S.2d 900 (1953). The plaintiffs there claimed that defendants had induced a breach of contract by Peru (the very theory of the action between the present parties in state court). Judge Botein dealt in the following language with plaintiffs' objections to the interposition of an act of state defense:

> The plaintiffs moved to strike the defenses, urging that they do not seek damages from Peru for its breach of contract but from these private defendants for their own tortious conduct in inducing and procuring Peru to break its contract. * * *
>
> * * * * * *
>
> The plaintiffs' characterization of the defenses as an attempt to immunize a private citizen for wrongdoing to another private citizen must be considered in juxtaposition to the assertion in their brief that such wrongdoing resulted in "an outright and unabashed repudiation" by Peru. Our courts are traditionally loath to resolve such issues.
>
> * * * * * *
>
> * * * Perhaps our courts should be even more sensitive to the involvements of a sovereign's action when the sovereign is not a party to the action, and the adjudication as it affects its prestige and dignity partakes of the nature of an ex parte proceeding. 125 N.Y.S.2d at 901, 903, 905.

(On remand, defendants' motion for summary judgment was granted. 133 N.Y.S. 2d 606 (Sup.1954).)

 It thus appears prima facie that the act of state doctrine precludes further adjudication of the present case. Plaintiffs, however, offer several further arguments against this result. They first contend that the doctrine has been sapped of its vitality and rationale by

the so-called "Sabbatino Amendment," 22 U.S.C. § 2370(e) (2).

 At issue is the significance of the "Sabbatino Amendment" vis-a-vis the act of state doctrine in general. From the plain wording and history of the legislation, that issue is easy to resolve. The statute prescribes, in relevant part:

> Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law * * * : *Provided*, That this subparagraph shall not be applicable * * * (2) in any case with respect to which the President determines that application of the act of state doctrine is required in that particular case by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court.

In intent and in actual effect, then, the statute "reverses"—in the absence of a request by the executive—the specific holding of the *Sabbatino* case, that

> the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law. 376 U.S. at 428, 84 S.Ct. at 940.

world of international diplomacy and politics, where an 'incident' involving the dignity of nations is measured by its explo-

sive potential as well as its legal implications."

Congress has thus legislated a judicial "presumption" with respect to the foreign relations demands of a limited category of act of state cases. As a matter of record, even this narrow presumption did not conform to the realities of executive judgment. The executive strenuously opposed the enactment of the legislation,[32] and it became law only as a rider to the Foreign Assistance Act— which is why the provision is called the "Sabbatino *Amendment*." In any event, this exception is by its terms extremely narrow, and in all other cases the act of state doctrine remains the law of the land. The legislation has been strictly construed, and courts have continued to rely upon act of state in cases deemed not precisely fitting the statutory language. *See* French v. Banco Nacional de Cuba, 23 N.Y.2d 46, 295 N.Y.S.2d 433, 242 N.E.2d 704 (1968) (no confiscation or taking, and no claim of right to property); F. Palicio y Compania, S.A. v. Brush, 256 F.Supp. 481 (S.D.N.Y.1966), aff'd, 375 F.2d 1011 (2nd Cir. 1967) (no violation of international law). Plaintiffs' assertion that the Amendment in effect pulled the rug out from under the act of state doctrine in all cases is groundless.

■ Indeed, plaintiffs appear to recognize this, for their next argument against the application of the act of state doctrine to this case is that the limited exception created by the statute controls here. Plaintiffs have charged in their complaint that the two territorial waters decrees issued by Sharjah, and the amendment of its contract with Buttes and Clayco, constituted "in effect an attempted confiscation, without compensation, of plaintiffs' vested property rights in the oil and gas to which they were entitled * * * in violation of international law." Compl. ¶ 22(d); *see* ¶ 22 (f), (g). This pleading is insufficient to invoke the Sabbatino Amendment for several reasons. In the first place, the charge of an attempted confiscation, invalid under international law, has not been directed against the other acts of state—by Sharjah and also by Iran, Umm al Qaywayn, and Great Britain— adjudication of which would form an integral part of plaintiffs' case. Moreover, the portion of the complaint here in issue does not itself fall within the Sabbatino Amendment's ambit, for the simple reason that the complaint refers to an "attempted confiscation," whereas the statute applies only to a "confiscation or other taking." It is clear from a reading of the complaint as a whole that the conduct of Sharjah did not amount to an effective confiscation;[33] rather, plaintiffs were allegedly deprived of the enjoyment of their concession only by the cooperative effect of a number of acts of state, of which Sharjah's claims were not the most efficacious. This is not a situation at which the Sabbatino Amendment was aimed.[34]

32. Hearings on Foreign Assistance Act of 1964 Before the Sen. Comm. on For. Rel., 88th Cong., 2nd Sess., App. 618–19 (1964); Hearings on Foreign Assistance Act of 1965 Before the House Comm. on For. Aff., 89th Cong., 1st Sess., pt. 8, at 1234–71 (1965). In addition, the executive successfully argued in *Sabbatino* against judicial adoption of the Amendment's approach. 376 U.S. at 436, 84 S.Ct. 923; Brief for the United States as Amicus Curiae 43–46.

33. Regardless of the wording of the complaint, it would be conceptually and prudentially hazardous to treat the territorial waters claims of Sharjah as a "confiscation," subject to adjudication under the international legal standards governing that kind of act. Claims to territory are a different matter from the expropriation of corporate property within or appertaining to that territory, *see* Latvian State Cargo & Passenger S.S. Line v. United States, 116 F.Supp. 717, 720, 126 Ct.Cl. 802 (1953). Moreover, territorial waters claims are subject to a body of international law wholly different from that relating to expropriations. *See generally* M. McDougal & W. Burke, The Public Order of the Oceans 486–98, 520–61 (1962).

34. It is unnecessary to decide the proffered questions whether the Sabbatino Amendment does not apply to a taking of contractual rights, and whether the Amendment is intended only for cases in which

Plaintiffs next contend that Sharjah and Umm al Qaywayn do not qualify as "states" under the act of state doctrine, because they have delegated to Britain ultimate authority over their foreign relations. The authority cited by plaintiffs indicates a contrary result. In Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena, 293 F.Supp. 892 (S.D.N.Y.1967), aff'd, 433 F.2d 686 (2nd Cir. 1970), the act of state doctrine was held applicable to Wuerttemberg, one of the constituent states of West Germany. After citing cases that had accorded act of state treatment to similar national subdivisions,[35] the district court noted that Wuerttemberg "has had the power to engage in foreign relations with the consent of the Government of West Germany and has done so. See Article 32, West German Constitution * * *." 293 F.Supp. at 910; aff'd, 433 F.2d at 703. Under the holding of the Zeiss case and the authority on which it relied, the application of act of state to the Trucial States would appear to follow a fortiori. Previously recognized as independent sovereigns by Britain,[36] the Trucial States acceded supervision over their foreign relations to the latter only by a series of treaties. H. Albaharna, The Legal Status of the Arabian Gulf States 70–74 (1968). While the precise international status of these sheikdoms is at present unique and difficult to characterize, see id. ch. 8, their degree of international personality is obviously greater than that, say, of Wuerttemberg. Bearing in mind especially the foreign affairs roots of the act of state doctrine, the court concludes that the doctrine applies to Sharjah and Umm al Qaywayn.

Nor is this conclusion disturbed, as regards Sharjah, by plaintiffs' assertion that some of the conduct of its Ruler was motivated by "his own personal gain and benefit." Compl. ¶ 22(c). Jimenez v. Aristeguieta, 311 F.2d 547 (5th Cir. 1962), relied on by plaintiffs, holds only that crimes committed by a chief of state outside or in violation of his official authority are not acts of state. Id. at 557–558. Contrariwise, the complaint clearly indicates that the Ruler of Sharjah acted at all times in his official capacity and on behalf of his state. In these circumstances, as the Jimenez case itself holds, the act of state doctrine applies. Id. at 557.

*Conclusion*

For the reasons elaborated above, the act of state doctrine precludes this court from further adjudication of the instant complaint. The Buttes defendants in their briefs have contended that this defect of the complaint is jurisdictional. But it is clear from Ricaud v. American Metal Co., 246 U.S. 304, 308, 38 S.Ct. 312, 62 L.Ed. 733 (1918), quoted with approval in Sabbatino, 376 U.S. at 418, 84 S.Ct. 923, that this is not so; rather, the questioning of sovereign acts by the complaint results in its failure to state a claim upon which relief may be granted. American Banana, supra, 166 F. at 267. When confronted with this discrepancy of grounds at oral argument, counsel for the Buttes defendants contended finally that the court should "in the exercise of its jurisdiction" dismiss the complaint. The Buttes motion is, in any event, denominated as one under Fed.R.Civ.P. 12 (b) (6) as well as 12(b) (1). In these circumstances, any misconstruction, in the briefs, of the act of state doctrine's import does not foreclose proper disposition of the motion. See Mota v. Boyd,

confiscated property comes before the court. The second of these issues is currently being litigated in a setting demanding its resolution. See Banco Nacional de Cuba v. First National City Bank, 270 F.Supp. 1004 (S.D.N.Y.1967), rev'd, 431 F.2d 394 (2nd Cir. 1970), vacated, 400 U.S. 1019, 91 S.Ct. 581, 27 L.Ed.2d 630 (1971).

35. Shapleigh v. Mier, 299 U.S. 468, 57 S.Ct. 261, 81 L.Ed. 355 (1937); Stark v. Howe Sound Co., Inc., 280 N.Y. 622, 20 N.E.2d 1007 (1939).

36. The Trucial States continue to be accorded sovereign immunity by the British courts. See Antoun v. Harrison & Sons, Ltd. (Q.B.1965), quoted in H. Albaharna, The Legal Status of the Arabian Gulf States 147–48 (1968).

**114**

Weir & Sewell, Inc., 206 F.Supp. 306 (S. D.N.Y.1962); *cf.* Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 249–250, 71 S.Ct. 692, 95 L.Ed. 912 (1951).

The Buttes defendants' motion to dismiss will be granted for failure to state a claim upon which relief may be granted.

In accordance with the foregoing,

IT IS ORDERED that the motion of the Clayco Petroleum Corporation and Bruce J. Clayman to dismiss the action is granted.

IT IS FURTHER ORDERED that the motion of the Buttes Gas and Oil Company, John Boreta, and William H. Smith to dismiss the action is granted.